TED MONIUSZKO, Plaintiff-Appellee, v. HELEN MONIUSZKO, Defendant-Appellant.

First District (1st Division) Nos. 1—91—0379, 1—91—0383 cons.

Opinion filed November 16, 1992.

Peraica & Della Rose, P.C., of Chicago (Anthony J. Peraica, of counsel), for appellant.

Baker & Martier, of Chicago (Ruth V. Enright and Robert S. Baker, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Helen Moniuszko, appeals from an order of the circuit court which found that certain property was held by Helen and plaintiff, Ted Moniuszko, in joint tenancy.

We affirm.

The centerpiece of this appeal concerns the ownership of the property, a six-flat apartment building (six flat), located at 3616 West 55th Street in Chicago. The Moniuszkos used one of the building's apartments as a residence, and the remaining apartments, were rented to tenants.

On June 1, 1985, Ted filed a complaint for dissolution and accounting, in which he alleged that he and Helen entered into an oral partnership agreement for the purchase of the six flat. Ted charged that Helen had him forcibly evicted from the premises on September 14, 1982, and that since that date, Helen received all the income from the six flat and refused to pay him his just share of the six flat's income and profits. Ted sought an adjudication that the partnership existed, the dissolution of the partnership, an accounting of all dealings regarding the partnership, the sale of the property and a division of the proceeds, in addition to the costs of the litigation.

In response, Helen denied all the material allegations of the complaint and, in a counterclaim, alleged that she and Ted were divorced on May 23, 1974, pursuant to a judgment of the circuit court of Cook County. She further alleged that on May 1, 1978, Ted told her that he wanted to remarry her and proposed that they buy the six flat together to reside in with their children. According to the counterclaim, each party was to pay 10% of the down payment; however, Helen alleged that she provided the entire down payment. Helen further claimed that she and Ted lived together out of wedlock, but in the spring of 1982, Ted began to abuse her physically. Ted vacated the premises following the entry of an order of protection by the circuit court. Helen further alleged that in October 1983, Ted fraudulently defrauded her of her interest in the property by forging her signature on a deed.

On August 8, 1989, the circuit court ordered that the six flat be sold and that the proceeds be placed in an escrow account subject to further court order. During the ensuing months following the entry of that order, Ted filed numerous petitions for rules to show cause due to Helen's failure to cooperate with the realtors who were attempting to place the property on the market. The circuit court ultimately held Helen in contempt for her failure to comply with its order.

The cause apparently proceeded to trial on March 6, 1990.[1] Helen testified that she and Ted were married in April 1967 and were divorced in June 1974. After the divorce, she never lived with Ted. According to

---

[1]Ted contends that Helen has failed to provide this court with a complete transcript of the proceedings which occurred in the circuit court. The record of proceedings is not in chronological order and, when read in its entirety, indicates that transcripts from several sessions are missing. More importantly, none of the numerous exhibits introduced into evidence by both parties are included in the record on appeal. An appellant has the burden to present a sufficiently complete record of the proceedings at trial in order to support an appellate claim of error, and any doubts which may arise from the incompleteness of the record will be resolved against the appellant. *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 459 N.E.2d 958.

Helen, Ted had raped her, but she did not sign any papers charging Ted with rape. As a result of the rape, the couple's fourth child was born in 1976. Helen paid all the expenses incurred at the six flat. Although the building's utilities were kept in Ted's name, Helen stated that she paid all of the bills.

According to Helen, the 1974 judgment of dissolution awarded her the couple's marital home, which had been held in joint tenancy. This home, a bungalow, was located at 3841 West 55th Place in Chicago. Helen admitted that she never enforced the dissolution provision and that Ted never signed over to her his interest in the bungalow. However, it was Helen's testimony that Ted sold the bungalow without her knowledge and that she never signed any documents transferring her interest in the property to the purchasers. The Standard Federal Savings and Loan Bank (Standard Federal) "took" the proceeds from the sale and deposited them into a joint account in the couple's name. At that time, Helen did not question the method by which the bungalow was sold because she thought that Standard Federal was selling it and that the proceeds from the sale were to be transferred to the six flat. Helen believed that Standard Federal merely switched the title of the bungalow for the title of the six flat. She insisted that the bank unilaterally deposited the proceeds from the sale of the bungalow into the joint account, but that she did not want the proceeds to be treated in that manner. However, Helen also testified that the parties maintained the joint account "only then when we were buying the building."

On November 11, 1977, Ted told Helen he wished to remarry her and that was "why [they] got the contract on the new house as husband and wife." Helen recalled signing the contract on August 8, 1977, but claimed that the copy of the contract, introduced into evidence, contained a forgery of her signature.

Helen stated that she did not sign a deed in trust which put the six flat into a land trust at the Marquette National Bank. According to Helen, Ted's girlfriend, Gayle Pucher, forged Helen's signature on the document so that Ted could obtain capital for a business venture.

Dorothy Myczek, a "loan closer" for Standard Federal, handled the mortgage transaction for the parties with regard to the six flat on August 29, 1977. At the time of the closing, it was the bank's policy that all borrowers were required to be present. The mortgage note was signed by both Helen and Ted in accordance with this policy. The couple's loan application indicated that they had been married for 10 years, and the document was signed by Helen. Moreover, during the transaction, Helen never disclosed the existence of the 1974 divorce

decree. The bank considered the couple to be husband and wife. According to the bank records, Helen signed the withdrawal slip which indicated that funds from the couple's joint account were used for the mortgage down payment. Myczek also identified a passbook for the joint savings account which was in both Ted's and Helen's names, and she contradicted Helen's assertion that Standard Federal required Helen to maintain a joint account at the institution to facilitate the mortgage transaction. Moreover, Helen never made any complaints to the bank regarding forgery or fraud.

Ted testified that he married Helen in 1967. For the next 10 years, the couple owned the bungalow jointly. In early 1977, they sold the bungalow to friends of Helen. The sale resulted in proceeds of over $38,000, which were deposited into a joint account at Standard Federal. Ultimately, the couple used that money to buy the six flat, which had a purchase price of $142,000. The parties applied as a married couple for the mortgage at Standard Federal. Ted recalled that Helen was present at the closing along with their attorney. In the spring of 1978, the couple moved into the six flat, where Ted lived until 1982.

In 1982, Helen informed Ted, during a dispute, that they were divorced. Ted maintained that he was never served with any divorce papers and only learned about the entry of the judgment during a court appearance in 1982. During that court appearance, the circuit judge advised him that it would "be better to move out." Ted denied that he had raped Helen. Since 1982, Ted has not received any of the rents collected from the other tenants at the six flat, and he has not claimed any tax deductions from the building. Ted averred that he had made monetary contributions to the six flat, but had not received any reimbursement from Helen. The utilities were in his name and were paid by him.

Ted admitted that he had stopped filing joint Federal tax returns in 1977. From 1974 through 1976, Ted used his parents' address for his income tax return. In 1974, he filed his return as a single person because Helen had told him that she intended to file a single return. Ted's 1979, 1980, and 1981 income tax returns listed the six flat as his address. Ted stopped claiming deductions for the six flat in 1982.

In early 1980, Ted founded his own business, the T.M. Tool and Die Company. In order to secure capital to start the company, Ted obtained financing from the Marquette National Bank. To that end, the six flat was put into a land trust at Marquette National. Ted testified that both he and Helen, together, executed the deed in trust which conveyed the six flat into the land trust.

Two of the couple's children, Alice Moniuszko and Christina Spiewak, testified that Ted never lived with them at the six flat during the time in question. Christina maintained that all the utilities were kept in her mother's name; however, during cross-examination, she identified a utility bill for the six flat which was in Ted's name.

Greg Rademacher, a document examiner for the Chicago police department, testified on Helen's behalf. He examined Helen's signature on the Marquette National Bank land trust and compared it with several known samples of Helen's signature. Based on his examination, he believed that the signature on the bank document was a forgery. Rademacher admitted, however, that Helen did not provide him with the number of samples he usually required for handwriting comparisons.

Following closing arguments, the court ruled that it was

"convinced that a gift was certainly made or if not, there is some reasonable grounds for suspicion that Mr. Moniuszko did not even know that he was, in fact, divorced and that a joint tenancy was intended and carried out at the time of the purchase of this building. However this Court also finds that Mrs. Moniuszko albeit maintained this building for a great deal of the time of its occupancy, did management work apparently and so forth."

The court further found that the "gross nest egg" from the sale of the six flat was $165,000 plus the interest earned to date. Of that sum, Ted was awarded $73,700 and Helen was awarded $86,750.

Helen contends that the circuit court's determination that a gift was made by Helen to Ted of "joint and several interest in the proceeds from the sale of the Bungalow, when said sale proceeds were deposited into the joint savings account at Standard Federal is not supported by the evidence." However, we disagree with Helen's characterization of what the circuit court found to be a "gift." We do not believe the court was referring to the joint account itself, but rather, was referring to the money Helen took from the joint account and used for the down payment at the time of the purchase of the six flat.

Helen's testimony, although often confusing, contradictory, and contentious, nevertheless revealed that she wished to purchase the six flat with Ted and that the couple, using funds from the joint account which by virtue of the 1974 divorce decree belonged solely to Helen, obtained a contract for the six flat as husband and wife. Helen admitted that she signed such a contract on August 8, 1977, although at trial, she contended that the copy of the document was a forgery.

A "gift" is a voluntary, gratuitous transfer of property by one person to another where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee. (*In re Marriage of Cook* (1983), 117 Ill. App. 3d 844, 453 N.E.2d 1357.) The elements of a valid gift are donative intent, the donor's parting with the exclusive dominion and control over the subject of the gift, and delivery to the donee. (*Pocius v. Fleck* (1958), 13 Ill. 2d 420, 150 N.E.2d 106; *Wencordic Enterprises, Inc. v. Berenson* (1987), 158 Ill. App. 3d 913, 511 N.E.2d 907.) Intent and delivery are separate elements of proof and the fact that delivery of the alleged gift has occurred is not conclusive as to whether a gift has been made. (*In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651, 409 N.E.2d 321.) Donative intent is the intention on the part of the donor that there be a present and irrevocable transfer of title to the subject matter of the gift. Delivery of the subject matter of the gift is the means by which the donor's intent is given effect. (*Gordon v. Gordon* (1969), 113 Ill. App. 2d 191, 252 N.E.2d 17.) In order to create a gift, there must be some communication, oral or written, of donative intent between donor and donee. (*In re Estate of Miller* (1973), 11 Ill. App. 3d 867, 297 N.E.2d 12.) A gift to donee is not shown unless the donor has relinquished all present and future dominion and power over the subject matter of the gift. *In re Marriage of Cook*, 117 Ill. App. 3d at 849.

Whether a gift has been made is question of law, and on the facts in the particular case, it involves a mixed question of law and fact. (38 Am. Jur. 2d *Gifts* §108 (1968).) The alleged donee carries the burden of proving the existence of donative intent in the donor, and proof must be clear and convincing in order to establish the gift. *Schramm v. Schramm* (1958), 13 Ill. 2d 281, 148 N.E.2d 799.

Based on the testimony adduced at trial, we are of the opinion that the elements required for a finding that a gift was made were established. Helen herself admitted that the couple bought the six flat together as husband and wife, and her signature appears on the mortgage. We also note, in particular, the testimony of Myczek, the loan officer who conducted the mortgage transaction and who was a disinterested witness. Myczek's testimony not only contradicted Helen's testimony almost entirely, but supported Ted's version of the events at that time. Myczek further stated that Helen herself withdrew the money from the joint account and presented it as the down payment for the six flat. During her testimony, Myczek identified a receipt that was signed by Helen at the time of the closing. The receipt indicated that the funds for the down payment were taken from the

joint account. Moreover, Helen's signature appears on the mortgage for the six flat. Helen's behavior at the time of the closing suggests that she voluntarily used the money from the account to purchase the six flat jointly with Ted.

In order to reverse a finding of a circuit court, that finding must be against the manifest weight of the evidence. For a finding to be against the manifest weight of the evidence, it must appear that the conclusions opposite to those reached by the trier of fact are clearly evident. (*Gary-Wheaton Bank v. Meyer* (1985), 130 Ill. App. 3d 87, 473 N.E.2d 548; *J.R. Sinnott Carpentry, Inc. v. Phillips* (1982), 110 Ill. App. 3d 632, 443 N.E.2d 597.) Much of Helen's testimony was contradicted or was unbelievable, such as her assertion that she did not attend the closing when documents executed at that time contain her signature. Moreover, Helen testified that she never lived with Ted following the entry of the 1974 divorce decree; however, in her counterclaim, Helen stated that the couple lived together out of wedlock until 1982. Helen was also impeached by a prior statement made under oath in the 1982 court proceeding in which she told Judge Karnezis that she and Ted were living together. Witness credibility and the resolution of conflicts in evidence are matters within the discretion of the trial judge and should not be disturbed upon review. (*Silas v. Robinson* (1985), 131 Ill. App. 3d 1058, 477 N.E.2d 4.) Here, the trial judge resolved such conflicts against Helen. We find nothing in the record which would warrant reversal of these determinations. Accordingly, the court's findings are not against the manifest weight of the evidence.

Helen also challenges the circuit court's determination that a joint tenancy was intended and carried out at the time of the purchase of the six flat. In her brief, Helen refers to an instrument known as the "Trust Deed from the Ford City Bank and Trust Co., as Trustee under Trust Number 1574 as seller of the Six Flat to Ted Moniuszko and Helen Moniuszko, his wife, as joint tenants." This document, however, does not appear in the record on appeal. Since Helen admits its existence, we will assume the document was presented to the circuit court.

Our supreme court has held that an instrument creating a joint tenancy presumably speaks the truth. (*Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 591, 202 N.E.2d 470.) The party disputing the instrument bears the burden of proof, which must rise to the level of clear and convincing evidence. *Murgic v. Granite City Trust & Savings Bank*, 31 Ill. 2d at 591.

The evidence adduced at trial clearly supports the circuit court's determination regarding the creation of the joint tenancy. As we have

noted previously, Helen's recollection of many of the events differed greatly from those of Ted and Myczek. Apparently, the trial judge resolved these conflicts in Ted's favor. Determinations regarding credibility and weight of testimony should be given deference upon review because it is the trial judge who enjoys the best position from which to observe the demeanor of witnesses. (*Silas v. Robinson* (1985), 131 Ill. App. 3d 1058, 477 N.E.2d 4.) Based on the foregoing, the determination is not manifestly erroneous.

■ Helen next contends that the amount of money she received from the proceeds of the sale of the six flat was manifestly erroneous. In her brief, Helen states that she received $73,700. This is not true. The record clearly indicates that the circuit court awarded Helen a sum of $91,200, which was reduced by $4,450 to cover the legal expenses incurred by the new owners of the six flat. Therefore, the net amount awarded to Helen was $86,750.

The determination of damages by a circuit court sitting without a jury will not be set aside unless it is manifestly erroneous. (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *In re Estate of Chaitlen* (1989), 179 Ill. App. 3d 287, 534 N.E.2d 482.) The law only requires there be an adequate basis in the record for the court's determination, and absolute certainty is unnecessary. *Schatz,* 51 Ill. 2d at 147; *Chaitlen,* 179 Ill. App. 3d at 292.

Although Helen correctly notes that joint tenants are equally liable for the cost of necessary repairs as well as payment of the mortgage and real estate taxes (*Titsworth v. Stout* (1868), 49 Ill. 78; *Gilmore v. Gilmore* (1975), 28 Ill. App. 3d 36, 328 N.E.2d 562), a review of the record reveals that the trial judge properly considered and evaluated the evidence relating to the components of the contributions allegedly made by each party. We will not set aside that determination, particularly when a complete record of the proceedings is unavailable.

■ Helen also maintains that her trial attorney failed to provide her with competent representation and that, as a result, she did not receive a fair trial.

In Illinois, the actions of an attorney in the conduct and management of a case are binding on the client. (*Ruggio v. Ditkowsky* (1986), 147 Ill. App. 3d 638, 498 N.E.2d 747, *appeal denied* (1987), 113 Ill. 2d 584, 505 N.E.2d 361; *Laff v. John O. Butler Co.* (1978), 64 Ill. App. 3d 603, 381 N.E.2d 423, *cert. denied* (1979), 444 U.S. 844, 62 L. Ed. 2d 57, 100 S. Ct. 88.) At no time during the trial did Helen indicate to the trial judge that she believed trial counsel was inadequate in presenting her case. Accordingly, her argument is unpersuasive.

As to Helen's assertions that the trial judge was prejudiced and hostile to her, the record indicates that Helen's behavior at trial was contemptuous and disrespectful. In one such instance, Helen refused to comply with the court's order for the sale of the six flat:

"THE COURT: *** Mrs. Moniuszko, I hereby order you to sign these documents, turn over the keys, and further comply with the prior orders of this Court. She is to do that forthwith.

MRS. MONIUSZKO: I will not sign.

\* \* \*

THE COURT: As you know I have given you [Helen's counsel] almost a half hour to discuss with your client this Court's order that she comply with this Court's prior order where this Court directly ordered her to sign the documents to perfect the closing of the sale of the premises which were worded as a preliminary matter as you well know to the disposition of this case.

This Court I hope has never indicated how the proceeds are to be divided, if at all. The amount of money that is used to perfect the closing was and is to be held in escrow, all the net proceeds pending the final disposition and judgment of this Court.

This Court is straining, as you all know, to give your client an opportunity to fairly present her and your theory of the case. The case that has been pending on this case has been attempting to try [sic], and your client must understand that this Court has a very primary duty. That is this Court must enforce its orders.

*** Are you willing to sign these papers as this Court has ordered?

MRS. MONIUSZKO: No. No. I am not going to sign."

The court then found Helen in contempt and ordered her to be taken into the custody of the Cook County sheriff. The following then occurred:

"[THE COURT:] Let the record show that for the record that Mrs. Moniuszko was just threatening me that she is going to go to Congressman Lapinski and Christianiac and some alderman apparently to attempt to intimidate this Court."

The record contains other instances of Helen speaking out of turn, and many of the judge's remarks referred to by Helen in her brief were precipitated by her own conduct. In view of the court's distribution of the proceeds from the six flat, of which Helen received the

larger share, it is difficult to give credence to her contentions that the trial judge was prejudiced against her.

The judgment of the circuit court is affirmed.

Affirmed.

BUCKLEY, P.J., and MANNING, J., concur.