ALBERT T. HOWARD *et al.*, Plaintiffs-Appellees, v. ZACK COMPANY, Defendant-Appellant.

First District (5th Division)   No. 1—92—3442

Opinion filed June 30, 1994.—Rehearing denied August 4, 1994.

William T. Rodeghier, of Chicago (Katrina Veerhusen and Thomas S. Moore, of counsel), for appellant.

Beermann, Swerdlove, Woloshin, Barezky, Becker, Genin & London and Harvey L. Walner & Associates, Ltd., both of Chicago (Alvin R. Becker, Harvey L. Walner, and Annette E. Pinhasik, of counsel), for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, Zack Company (Zack), appeals from the circuit court judgment entered against it in a retaliatory discharge action brought by plaintiffs, Albert T. Howard (Howard) and Sharon L. Marello (Marello). The circuit court, sitting without a jury, found that Zack discharged Howard and Marello in retaliation for reporting violations of Federal laws and regulations governing quality assurance and document control for nuclear power plants. The court awarded Howard $27,960 in compensatory damages and $300,000 in punitive damages; Marello was awarded $11,960 in compensatory damages and $75,000 in punitive damages. On appeal, Zack contends that the circuit court's findings with regard to both liability and damages are against the manifest weight of the evidence.

We affirm.

BACKGROUND

At all relevant times, Zack was in the business of fabricating and installing heating, ventilating, and air-conditioning (HVAC) systems in nuclear power plants. HVAC work, like all other construction work at nuclear power plants, is highly regulated.

Title 10, Part 50, of the Code of Federal Regulations establishes mandatory quality assurance criteria for the construction of nuclear power plants and their component systems and parts. (10 C.F.R. Part 50, app. B (1981).) Among other things, Federal regulations require that the subcontractors working at nuclear power plants, such as Zack, be able to verify that the materials used in construction meet the nuclear standards promulgated by the American Society of Mechanical Engineers. Compliance with these standards is normally insured through stringent record-keeping procedures. Federal regulations dictate that procedures exist for storage and retrieval of documents which verify the origins and specifications of materials used in the construction of nuclear power plants. Among other things, these procedures enable engineers to predict the serviceability and/or failure rate of these materials.

In the fall of 1976, Zack contracted with Consumer Power to do HVAC work at its nuclear power plant in Midland, Michigan. That work continued until the spring of 1980, when Zack came under investigation by the Nuclear Regulatory Commission (NRC). The NRC had received allegations about a quality assurance breakdown at Zack which included falsified records, discrepancies in material traceability, inadequate procedures, and unqualified quality control personnel.

During its investigation, the NRC determined that quality assur-

ance deficiencies did exist at Zack and the deficiencies were caused by noncompliance with approved record keeping and control procedures. The NRC issued a report disclosing its findings, and in January 1981, it assessed civil penalties in the amount of $38,000 against the licensee, Consumer Power, for those quality assurance deficiencies. In response, Bechtel Power Corporation, the general contractor at the Consumer Power's Midland nuclear power plant, issued a stop work order to Zack.

At this time, it became clear to Christine Zack (Christine), the president and CEO of Zack, that an all-encompassing quality assurance program with a centralized document control function was needed. She hired the NUS company to review the existing quality functions at Zack and recommend improvements. NUS sent David Calkins (Calkins) to Zack to perform the quality control audit, and eventually, Christine hired Calkins away from NUS and made him the quality assurance manager of Zack.

In August 1981, Calkins informed Christine that he had discovered that an employee named Carl Eichstaedt had forged someone else's signature on an original certified material test report (CMTR). The CMTR identifies the physical and chemical composition of metal and is provided by the suppliers from whom Zack acquires material. Upon confrontation, Eichstaedt admitted that he forged the certificate. After further investigation, Calkins determined that the problem was potentially reportable under applicable Federal regulations. Within a month, he also determined that Zack's document problems did not pertain solely to one plant, but instead could potentially impact all of the nuclear plants at which Zack was working. Christine instructed Calkins to notify the utilities, identify the scope of the problem and take corrective action.

In response, Calkins generated a document entitled "Corrective Action Request No. 14" (CAR 14) which contained a written description of the discrepancies, the corrective action to be taken and the steps to prevent recurrence. CAR 14 identified generic categories of pervasive, recurring problems.

Calkins advised Christine that Zack needed to hire additional employees because he anticipated that implementation of the corrective action under CAR 14 would require a lengthy program. He proposed creating a document control department which would consist of three quality assurance engineers, one document control supervisor, and three document control clerks. In October 1981, Calkins recommended Howard, who was an old friend, for one of the document control clerk positions, and in November 1981, Howard was promoted to supervisor of the document control department.

Prior to his employment with Zack, Howard had been a grammar school teacher for 25 years and had been unemployed for a long period of time. Marello was also hired as a document control clerk; she had been a waitress prior to coming to Zack. In addition to Howard and Marello, three individuals with technical expertise, including Ronald Perry, were brought in on a temporary basis from Quantech to fill the quality assurance engineer positions. Finally, a representative of Consumer Power, Howard McGrane, assisted in the implementation of CAR 14.

As document control clerks, Howard and Marello were to gather CMTRs and match them with purchase orders. Clerks were to check the CMTRs for alterations, such as whiteout or stickers appearing on the face of the document, incorrect referencing of chemical and physical standards, typographical errors, crossouts, or written additions to the face of the document. When an altered CMTR was discovered, clerks were to contact the manufacturer to acquire a new, corrected CMTR. If they were unable to acquire a corrected version, the altered CMTR was submitted to the quality assurance department and that department would determine whether materials listed in the altered CMTR needed to undergo testing by Zack's engineers. The quality assurance department would also determine whether the problem CMTR needed to be reported to the utilities.

The clerks also scrutinized the purchase orders to verify that the supplier listed therein was included on the approved vendor list. Approved vendors were vendors who met certain criteria established by title 10 of the Code of Federal Regulations. As with altered CMTRs, the clerks reported problem purchase orders to the quality assurance department and that department would determine whether the utilities should be notified.

Although CAR 14 was implemented in response to existing problems with inadequate or falsified CMTRs and purchase orders at Zack, Howard and Marello observed ongoing compliance problems. Plaintiffs were disturbed by the continuing nature of Zack's quality assurance problems, and Perry shared their concerns. Perry testified that in his opinion, CAR 14 did not accurately describe the problem. He stated that the description of Zack's problems was "watered down" and the situation at Zack was much more serious than documented. Perry also stated that he observed ongoing problems at Zack, and he opined that CAR 14 was not being complied with while he was there.

In January 1982, Perry and Howard met with Calkins to inform him of their concerns about the inaccuracy of interim reports issued to utilities and to discuss their dissatisfaction with the progress of

Zack's quality assurance program. At this time, Perry and Howard requested that a more accurate report be prepared. Perry testified that although Calkins initially resisted their request, eventually the report was completed to Perry and Howard's satisfaction.

Due to his continuing concern about the gravity of the document control problem, Perry contacted Walter Shewski, Commonwealth Edison's corporate manager of quality assurance, and advised him that control over documents at Zack was inadequate and that CAR 14 had downplayed the seriousness of the problem. The next day, Raymond Basiaga, a quality assurance engineer at Zack, told Perry that he had made a mistake in contacting Commonwealth Edison about his concerns. Also the next day, two auditors from Commonwealth Edison came to Zack and performed an audit. Shortly thereafter, Perry left Zack's employ. Zack had hired Perry for a three- to six-month period in order to correct the document control deficiencies; six months had elapsed from the time that he had been hired and Zack informed him that his services were no longer needed.

Howard believed that serious compliance problems continued to exist in the document control procedures. For instance, he discovered that Eichstaedt had written to one of Zack's vendors and requested that it issue a letter of conformance with certain technical specifications for certain materials the vendor had supplied. Eichstaedt had enclosed an unsigned copy of the conformance letter for the vendor to use as "an example." Howard considered this procedure improper because no one was to have any correspondence with vendors without the knowledge of the document control department.

In addition, Howard discovered a purchase order which indicated that 40,000 bolts had been sent back to Delta Screw, one of Zack's vendors. However, the shipment had actually gone to the Midland nuclear power plant construction site. Howard also received purchase orders from vendors who were not on the approved vendor list. He brought these problems to the attention of Calkins and Martin Skates (who succeeded Calkins as quality assurance manager) at a meeting in mid-March, but no action was taken with regard to the problems.

In April 1982, Howard again brought nonconforming documents to the attention of Skates. Rather than respond to Howard's concerns, a new policy was promulgated that made normal work hours 8 a.m. to 4:30 p.m. and stated that any and all overtime must be submitted to and approved by management. Because of Zack's lack of response, Howard felt that he needed to find another avenue to report these incidents. He and Marello decided to contact Hank Leonard, the HVAC construction manager at the Midland quality assurance department (MQAD). Howard told Leonard that he needed his advice

because the problems at Zack were ongoing, and no one at Zack was listening to complaints from the document control department. Howard also told Leonard that Zack employees were tampering with quality records and material documentation, intimidating quality assurance personnel, and that responsible individuals who could have corrected or at least mitigated these conditions had not done so. Leonard visited Zack shortly thereafter and again they discussed these allegations. Howard testified that he told Leonard that he and Marello considered Leonard their last resort; if Leonard could not substantiate the allegations or would not act on them, they would have no alternative but to go to the NRC. However, in a deposition taken before trial, Howard stated that he had never intended to go to the NRC prior to his termination.

Several days after speaking with Howard, Leonard began an investigation of Howard's allegations concerning the existing problems with document control. Leonard interviewed document control personnel, including Howard and Marello. When Leonard finished his investigation, he informed Calkins of Howard's allegations. Calkins testified that Leonard told him that he found no evidence to substantiate the allegations. Leonard did not testify, however.

Howard, Marello, and the rest of the document control department members were terminated on April 30, 1982. At the time of their termination, the document control personnel were told that all members of the department were being terminated because their services were no longer needed. Less than two weeks later, employment advertisements appeared in the newspaper for document control management personnel at Zack.

After their termination, Howard and Marello informed the NRC of the ongoing document control problems at Zack. In subsequent months, the NRC interviewed plaintiffs and took their depositions. Howard provided the NRC with Zack documents. Audits were eventually done by the NRC and three utility companies with whom Zack did business. According to Calkins, if any of Howard's allegations had been substantiated, the applicable Federal regulations would have required the NRC or the utilities to direct corrective action reports to Zack. No corrective action reports were ever generated as a result of Howard's allegations.

In early 1983, Baldwin Associates, a general contractor at the Clinton nuclear site, conducted a series of audits and surveillances of Zack's quality assurance program. Baldwin Associates found a number of deficiencies in Zack's document control program, including incomplete records, problems with material traceability, alteration of

documents, and improper procurement of materials for use at the Clinton Power Station. Baldwin Associates concluded that its continued involvement in Zack's quality assurance program would be required through the completion of the contract.

Christine denied discharging Howard and Marello in retaliation for reporting Zack's quality assurance problems and she insisted that she had valid reasons for terminating them. She stated that one of the reasons that she terminated Howard and Marello was because she believed that they had stolen quality assurance documents from Zack. On April 16, 1982, her secretary, Alice Taggart, informed Christine that a couple weeks prior she had seen Marello and Howard carrying boxes of documents to their cars. In addition, Christine stated that she did not believe that Howard possessed the capabilities necessary to assume a supervisory position in the document control department and she gave three reasons for her belief. First, she testified that, in March 1982, Don Malzahn and Carl Eichstaedt informed her that the document control department was, in their opinion, creating a purposeful slowdown of materials out of the shop to the nuclear construction sites; she held Howard responsible for this slowdown. Second, Christine testified that on April 28, 1982, Howard overstepped his responsibilities by requesting a pay raise for two of the document control clerks. Third, Christine testified that when she requested in CAR 20 that Howard devise a document control training procedure and an associated reading list, Howard responded inappropriately. In contrast, Howard received a performance evaluation in January 1982, in which Calkins rated him an above average employee.

Both Howard and Marello testified to seeking other employment after their termination from Zack. Marello found work sometime in 1983, about one year after her termination at Zack. Howard ceased looking for work in December of 1982 and went into the real estate business with his daughter and son-in-law. He testified that he made very little money in 1983 because he was not a very successful real estate salesman. Howard sought damages for lost wages in 1982 and 1983; Marello sought damages for lost wages in 1982.

Christine testified that Zack's net worth averaged $7.5 million through 1989, and her testimony was corroborated by tax returns filed by Zack for the years 1986 through 1989. Christine also testified that Zack's costs of $50 million in 1990 exceeded its gross receipts of $34 million, leaving a negative net worth of $16 million. She testified that Zack's business losses in 1990 "wiped out" its previous net worth, and at the time of trial she estimated that the company's net worth was a negative $10 million. However, no corroborating evidence was

presented regarding Zack's financial condition for the years after 1989.

At the conclusion of the trial, the circuit court delivered an opinion detailing its findings, which we summarize here. The circuit court found that Zack was under severe pressure to set up a quality assurance program due to the $38,000 fine that Midland had received. Zack retained and then later hired Calkins to set up a quality assurance program. Calkins hired a former school teacher, Howard, and a former waitress, Marello, along with two others who also had no quality assurance experience to take on a massive task—to gather thousands of documents which were scattered throughout Zack's facility and somehow make sense of them.

The court further found that Zack knew that plaintiffs were not qualified to be quality assurance personnel and that ultimately plaintiffs became "foils and scapegoats" for Zack. In the court's view, Zack management underestimated Howard, and he proved to be very tenacious about ensuring that documents were accurate and that proper procedures were followed.

The court noted that instead of discrediting Eichstaedt, who had admitted to forging documents in the past, he was given free run of the document control department. Several people testified that he removed documents, including original documents, and that he perhaps changed them and then placed them back in document control.

The court concluded that Zack's motivation was to speed through the documents by any means possible, and not to be overly concerned about accuracy or policy. On the other hand, Howard's only motivation was to do his job. He uncovered and discussed the RMC, Weld Star, and Delta Screw problems, all of which occurred after CAR 14 was implemented. The fact that they could arguably be corrected did not change the fact that they existed and that they arose after CAR 14, but they were not being subsequently addressed other than in the most superficial manner.

The court observed that Zack initially attempted to portray Howard as a bumbler, and then as a liar and a loose cannon. However, the court found that Howard's testimony was corroborated by the testimony of Perry and the Baldwin Report issued in 1983 which indicated that quality assurance problems at Zack were real and ongoing.

In the court's view, Eichstaedt appeared to be the loose cannon in this case. The court found that Howard revealed a problem of greater scope and depth than Zack was willing to admit to the utilities or the NRC. Howard pointed out that the problems at Zack were being

downplayed by management and that they were ongoing, partly because of Eichstaedt's unfettered conduct. The court found it inconceivable that after Eichstaedt had created so many problems, he was not fired but instead, was temporarily demoted and then promoted.

The court concluded that Zack had the motivation to deceive and that the totality of the evidence strongly supported the inference that Zack did so. The court found that Howard and, by extension, the entire department was terminated due to Christine's anger at Howard for complaining to Calkins and to the MQAD department, and thus, in retaliation for their conduct. The court further found that Zack did intend to harass them by requiring them to punch a time clock when they did not have to before and to begin to request overtime when management knew of the huge time constraints involved.

Moreover, the court found that Christine's memorandum of April 30, 1982, to Howard further evidenced her anger towards him when he was attacked as an example of the "Peter Principle." Prior to that time, he had never been reprimanded, as he should have been according to the policy manual which was admitted into evidence. If management had disapproved of his behavior, that would have been the proper route to go. Instead, the court concluded that Zack was looking for an excuse to fire Howard. Finally, the court found that Alice Taggart's testimony regarding the alleged theft of the boxes of original documents by the plaintiffs was patently incredible.

Therefore, based on the reasons stated and the totality of the evidence presented, the court held that the plaintiffs had established liability on the part of Zack. The court awarded Howard $27,960 in compensatory damages and $300,000 in punitive damages; Marello was awarded $11,960 in compensatory damages and $75,000 in punitive damages.

OPINION

I

■ The tort of retaliatory discharge is a limited and narrow cause of action recognized as an exception to the general rule that an "at-will" employee is terminable at any time for any reason or no reason. (*Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 505; *Paskarnis v. Darien-Woodridge Fire Protection District* (1993), 251 Ill. App. 3d 585, 586.) To establish a cause of action for retaliatory discharge, an employee must show that (1) he has been discharged; (2) in retaliation for his activities; and (3) that the discharge violates a

clear mandate of public policy. (*Hartlein v. Illinois Power Co.* (1992), 151 Ill. 2d 142, 160.) Zack maintains that no clear mandate of State public policy was violated in this case because Howard's dispute with Zack involved only Federal record-keeping requirements, as opposed to safety concerns.

There is no precise definition of the term "public policy." However, it can generally be said that "public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. [Citation.] Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, *** a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 130; see *Paskarnis*, 251 Ill. App. 3d at 587.

In Illinois, retaliatory discharge actions have been allowed in two settings: (1) when an employee is discharged for filing a claim under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1992); see, *e.g.*, *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172); and (2) when an employee is discharged for reporting illegal or improper conduct (see, *e.g.*, *Palmateer*, 85 Ill. 2d 124). (*Layne v. Builders Plumbing Supply Co.* (1991), 210 Ill. App. 3d 966, 974.) The only other situation recognized by Illinois courts as giving rise to a claim of retaliatory discharge occurred when an employee was discharged after refusing to work with an improperly functioning radioactive machine. *Layne*, 210 Ill. App. 3d at 974, discussing *Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502.

We believe the case at bar is analogous to *Palmateer* and the line of cases following it which hold that it is a violation of public policy to discharge an employee for reporting illegal or improper conduct. (See *Palmateer*, 85 Ill. 2d 124; *Johnson v. World Color Press, Inc.* (1986), 147 Ill. App. 3d 746; *Petrik v. Monarch Printing Corp.* (1982), 111 Ill. App. 3d 502.) In *Palmateer*, the plaintiff claimed that he had been discharged for informing a local law-enforcement agency that an International Harvester employee might be violating the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 1—1 *et seq.*). The supreme court stated that persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by fear of discharge. (*Palmateer*, 85 Ill. 2d at 132-33.) Further, since public policy favors volunteering information to law-enforcement agencies, discharging an employee for engaging in such conduct contravenes public policy and gives rise to an action for retaliatory discharge. *Palmateer*, 85 Ill. 2d at 133.

Similarly, *Johnson* involved allegations of Federal law violations. Johnson alleged that he was fired in retaliation for objecting to certain of the company's accounting practices, which he claimed constituted violations of Federal securities laws. The court held that he stated a claim for retaliatory discharge because violating Federal securities laws involved a clearly mandated public policy of national scope. *Johnson*, 147 Ill. App. 3d at 749-50.

Finally, in *Petrik*, the plaintiff alleged that in the course of performing his duties for his employer he discovered a discrepancy in the corporation's financial records which he believed may have been due to criminal conduct; he investigated the source of the discrepancy, and in an effort to force his employer to comply with the Illinois Criminal Code he reported his suspicions to management. Petrik alleged that he was discharged in retaliation for his efforts to ensure management's compliance with the requirements of the criminal law. The court concluded that the public policy considerations underlying *Palmateer* supported Petrik's conduct and held that Petrik had stated a cause of action for retaliatory discharge. *Petrik*, 111 Ill. App. 3d at 508.

■ Here, Howard reported violations of record-keeping requirements mandated by the Code of Federal Regulations. These rules were promulgated to ensure that materials used in the construction of nuclear power plants meet minimum quality standards. Proper record-keeping procedures enable those charged with the maintenance of nuclear plants to quickly and easily verify the type and source of the materials and components used to build nuclear power plants. We cannot agree with Zack's contention that this case does not implicate safety concerns. Without proper document control, regulators and inspectors have no way of verifying whether nuclear power plants have been safely constructed. Similarly, those charged with maintenance have no way of accurately predicting the serviceability and failure rate for power plants. We conclude that public policy favors the reporting of a good-faith belief that records relating to the construction of nuclear power plants are being falsified, tampered with, misplaced, and/or generally maintained under conditions violative of Federal regulations. Accordingly, we hold that discharging an employee because he reported such conditions contravenes public policy and gives rise to a cause of action for retaliatory discharge.

Zack next argues that the weight of the evidence shows that plaintiffs' allegations about record-keeping violations were false and not made in good faith. In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact. (*Kalata v.*

*Anheuser-Busch Cos.* (1991), 144 Ill. 2d 425, 433.) As the trier of fact, the trial judge is in a position superior to a court of review to observe the demeanor of witnesses, to judge their credibility and to determine the weight their testimony should receive. (*In re Application of County Treasurer* (1989), 131 Ill. 2d 541, 549.) Where the testimony is conflicting in a bench trial, the court's findings will not be disturbed unless they are against the manifest weight of the evidence. (*In re Application of County Treasurer*, 131 Ill. 2d at 549.) Moreover, a reviewing court may not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion. *In re Application of County Treasurer*, 131 Ill. 2d at 549; *Sexton v. Smith* (1986), 112 Ill. 2d 187, 194.

■ The thrust of Zack's argument is that since the NRC and other agencies investigated Zack and apparently found nothing to substantiate plaintiffs' claims, plaintiffs could not have been acting in good faith. However, substantiation of plaintiffs' beliefs that Zack was violating Federal regulations is not necessary to prove a cause of action for retaliatory discharge. (*Johnson*, 147 Ill. App. 3d at 751.) All that is required is that plaintiffs demonstrate a good-faith belief that such violations were being committed. (*Johnson*, 147 Ill. App. 3d at 751.) We note that at the time plaintiffs' concerns arose, Zack had already been sanctioned because of its improper record-keeping procedures and was in the process of trying to correct the deficiencies. While it is true that no further sanctions were levied against Zack as a result of plaintiffs' allegations, it is also true that no agency issued a report stating that Zack had brought its procedures in line with Federal regulations. Moreover, Baldwin Associates, a general contractor at the Clinton nuclear site, conducted a number of audits in 1983 and found a number of deficiencies in Zack's document control program, including incomplete records, problems with material traceability, alteration of documents, and improper procurement of materials for use at the Clinton Power Station. Hence, we do not view the lack of further action against Zack by the NRC or other agencies as dispositive of plaintiffs' good faith or lack thereof.

At trial, both Christine and Calkins attempted to portray Howard as a loose cannon who completely misunderstood the importance of his position and the significance of problems he uncovered. (We note that Zack was fully aware of the fact that Howard had no experience in the nuclear industry when it hired him.) Calkins testified that Howard was merely finding specific examples of "generic" problems that Zack was already aware of and in the process of correcting. In other words, Howard was simply uncovering the problems that he was hired to find. Calkins stated that Howard mis-

understood the significance of the specific problems that he uncovered and began sounding unnecessary alarms. Calkins suggested that Howard then blew conditions at Zack completely out of proportion because he was upset that he was not promoted to the position of quality assurance manager and because he possessed unreasonable beliefs about his own importance.

In contrast, plaintiffs testified that they observed ongoing, as opposed to historical, occurrences of the problems that Zack was supposed to be correcting. Plaintiffs testified that in their view, Zack was making little progress in curing its problems and simultaneously downplaying the seriousness of its problems to both the NRC and the power plant facilities for whom Zack did construction work. Plaintiffs were alarmed by the conditions existing at Zack and felt that their concerns were being ignored. Therefore, they believed that reporting their complaints to the power plant that Zack had contracted with was necessary.

Plaintiffs' testimony was corroborated by Perry and the report issued by the Baldwin Associates. We have already noted that Baldwin Associates conducted a series of audits in 1983 and found a number of deficiencies in Zack's document control program. Perry testified that in his opinion, CAR 14 did not accurately describe the problem. He stated that the description of Zack's problems was "watered down" and the situation at Zack was much more serious than documented. He testified that Zack's letters, dated October 23, 1981, to general contractors, Baldwin and Bechtel, also downplayed the seriousness of the problems. Perry explained that despite the forgery incident, Eichstaedt still came in and out of the document control room on a daily basis. Sometimes he requested documents, other times he retrieved the documents himself. According to Perry, the members of the document control department "had no control of Mr. Eichstaedt." Perry stated that he observed ongoing problems at Zack. For example, he observed instances where new purchase orders were sent out to vendors who were not on the approved vendor list. Perry opined that CAR 14 was not being complied with while he was there. Finally, Perry testified that he experienced pressure and interference at Zack which could be characterized as harassment.

It is clear that the trial judge chose to believe plaintiffs and Perry instead of Christine and Calkins. Resolving issues of credibility and conflicting evidence is a function which is peculiarly in the domain of the trial court. (See *In re Application of County Treasurer*, 131 Ill. 2d at 549.) Moreover, it is not the function of a reviewing court to reweigh the evidence. (See *Evans v. Sisters of the Third Order of St. Francis* (1987), 154 Ill. App. 3d 137, 140; *McMahon v. Richard Gorazd,*

*Inc.* (1985), 135 Ill. App. 3d 211, 219.) After careful review, we find that the record contains sufficient evidence to support the trial judge's conclusions.

■ Zack also argues that the weight of the evidence indicates that Christine had valid reasons for firing Howard and Marello which were unrelated to the reporting of the alleged record-keeping violations. As Zack correctly points out, in retaliatory discharge claims, the element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging an employee. *Hartlein,* 151 Ill. 2d at 160.

Christine testified that one of the reasons that she terminated Howard and Marello was because she believed that they had stolen quality assurance documents from Zack. Her belief was founded upon information provided to her by her secretary, Alice Taggart, who informed Christine that she had seen Marello and Howard carrying boxes of documents to their cars. In addition, Christine testified that she believed that Howard did not possess the capabilities necessary to assume a supervisory position in the document control department and she gave three reasons for her belief. She also testified that Howard overstepped his responsibilities by requesting a pay raise for two of the document control clerks who had only been with Zack for 90 days. Finally, Christine testified that she requested in CAR 20 that Howard devise a document control training procedure and an associated reading list. Although Howard responded to CAR 20 the next day, Christine believed that his response did not meet her request.

On the other hand, the evidence also indicated that Howard had been promoted from his original position of document control clerk to the position of document control supervisor, and he had received an evaluation which rated him an above average employee. Moreover, as the trial court observed, prior to the time that Howard was terminated, he had never been reprimanded despite the fact that Zack's policy manual provided for reprimands prior to termination.

It is clear that the trial court did not find Christine or any of the other Zack witnesses to be credible and stated as much in its opinion. As we stated above, credibility determinations are the function of the trier of fact. (See *In re Application of County Treasurer,* 131 Ill. 2d at 549.) In viewing the evidence in its entirety, we cannot say that the trial court's conclusions are against the manifest weight of the evidence.

## II

Zack next contends that the trial court erred in awarding dam-

ages because: (1) the compensatory damages awarded were not supported by the evidence; (2) punitive damages were improper in this case; and (3) assuming punitive damages were appropriate, the amount awarded was excessive.

The determination of damages by a circuit court sitting without a jury will not be set aside unless it is manifestly erroneous. (*Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 278; *Moniuszko v. Moniuszko* (1992), 238 Ill. App. 3d 523, 531.) The law only requires there be an adequate basis in the record for the court's determination, and absolute certainty is unnecessary. *Moniuszko*, 238 Ill. App. 3d at 531.

■ With respect to compensatory damages, the court concluded that the amounts requested—$11,960, which represented wages for the remainder of 1982 for Marello, and $27,780, which represented wages for 1982 and 1983 for Howard—were reasonable and supported by the evidence. Both Howard and Marello testified to seeking other employment after their termination from Zack. Marello found work sometime in 1983, about one year after her termination at Zack. The court computed Marello's damages based on one year's lost wages; since Marello was earning $5.75 an hour at Zack, 40 hours per week, 52 weeks per year, one year's wages totaled $11,960. Howard ceased looking for work in December of 1982 and went into the real estate business with his daughter and son-in-law. Apparently, Howard was not a successful real estate salesman and made very little money in 1983. The trial court based Howard's award on his lost income for 1982 and 1983, less the money he made in 1983 as a real estate salesman. We do not find the amount of compensatory damages to be against the manifest weight of the evidence in this case.

■ Zack also takes issue with the award of punitive damages in this case. Punitive damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Kelsay*, 74 Ill. 2d 172.) It is well settled that, when the facts permit, punitive damages may be properly awarded in retaliatory discharge cases. (*Kelsay*, 74 Ill. 2d 172; see *Motsch v. Pine Roofing Co.* (1988), 178 Ill. App. 3d 169, 177; *Witt v. Forest Hospital, Inc.* (1983), 115 Ill. App. 3d 481, 490-91.) Moreover, in *Kelsay*, a retaliatory discharge case based on the employee's filing of a claim for workmen's compensation, the supreme court noted:

> "In the absence of the deterrent effect of punitive damages there would be little to dissuade an employer from engaging in the practice of discharging an employee for filing a workmen's

compensation claim. \*\*\* [Therefore,] punitive damages must be permitted to prevent the discharging of employees for filing workmen's compensation claims." (*Kelsay v. Motorola, Inc.*, 74 Ill. 2d at 186-87.)

We believe that the concern for deterrence is equally relevant in the case at bar. In addition, the trial court's findings, which are not against the weight of the evidence, indicate that Zack did act willfully and wantonly. The trial court found that Zack's motivation was to speed through the documents by any means possible, and not to be overly concerned about accuracy or policy. The court further found that Zack intentionally hired document control personnel (Howard and Marello) with no experience and then used them as scapegoats. We conclude that the trial judge did not abuse its discretion in awarding punitive damages in this case.

■ Finally, Zack contends that the amount of punitive damages awarded was excessive. There is no bright line by which courts of review can separate proper awards from excessive awards. However, there are three factors which should be taken into consideration when evaluating punitive damage awards: (1) the nature and enormity of the wrong; (2) the defendant's financial status; and (3) the defendant's potential liability in other cases. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 711.) In arriving at the amount of punitive damages awarded in this case, the trial court made the following comments:

"I have looked at this case as from the point of view of what would deter the defendant from taking so lightly public safety ever again, and yet it is not my intention to put a defendant out of business, to give plaintiffs a windfall or to cause the loss of manufacturing jobs in this community during these hard times.

Balancing all of these factors, it is my considered opinion that an amount which would act as a signal that the people of the State of Illinois will not stand for and tolerate a lax attitude is the amount of $375,000, $300,000 on behalf of Howard and $75,000 on behalf of Marello. This amount represents five percent of the net worth of the company at the time of its occurrence and up until the last tax returns, which were in evidence which were 1989."

The record indicates that the trial court properly considered all of the factors listed in *Hazelwood* in making its decision. In this case, the trial court was primarily concerned with choosing an amount which would effectively deter Zack from engaging in similar conduct in the future. The court concluded that punitive damages in the amount of $375,000 would meet this objective. We do not find the award of $375,000 to be so large as to shock our judicial conscience.

Nor do we find the amount unreasonable in relation to the concerns raised by this case.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GORDON and McNULTY, JJ., concur.