First Division 

September 13, 2004 

No. 1-01-1002 

DOWD and DOWD, LTD., ) Appeal from the

 ) Circuit Court of

Plaintiff-Appellee, ) Cook County

 ) 

v. ) No. 98 L 5429

 ) 

NANCY J. GLEASON, DOUGLAS G. SHREFFLER, ) 

and GLEASON, McGUIRE AND SHREFFLER, ) Honorable 

 ) Loretta Douglas,

Defendants-Appellants. ) Judge Presiding.

JUSTICE O'MALLEY delivered the opinion of the court: 

Plaintiff, Dowd & Dowd, Ltd. (Dowd), filed suit against Nancy J. Gleason and Douglas G. Shreffler (defendants), after they resigned as shareholders (partners) of Dowd and opened a new law firm, Gleason, McGuire and Shreffler (GMS).  While working at Dowd, Nancy Gleason managed the Allstate Insurance Company (Allstate) account.  When the new firm was formed, Allstate moved its business to the new law firm.  Dowd filed suit against defendants, alleging breach of fiduciary duty, breach of employment contract, tortious interference with prospective economic advantage and civil conspiracy.  

The case was heard in a bench trial.  In February 2001, the court entered a judgment in favor of Dowd and denied defendants' mistrial motion.  In March 2001, the court found that there was no reason to delay enforcement or appeal.  Defendants now appeal.

The following issues are presented for review by defendants:     (1) whether the decision below misinterpreted the law as to attorneys and client retention; 

   (2) whether the decision below improperly used a finding of credibility to supercede failure of proof;

   (3) whether the court erred in denying defendants' motion for a mistrial after receiving and considering inadmissible "bad acts" testimony and accusing defendants of fraud and professional misconduct, and delaying issuing its decision for 18 months; and

   (4) whether the trial court's determination of damages was in error.

BACKGROUND
(footnote: 1)
 Dowd & Dowd is a law firm.  In 1975 or 1976, Northbrook Excess and Surplus Insurance Company, a subsidiary of Allstate, retained Dowd for advice on insurance coverage of claims that were being made against Allstate's policyholders for injuries arising from exposure to asbestos products.  Nancy Gleason, one of the defendants here, joined Dowd in 1977 as an attorney and for the next 13 years became the primary person handling the Allstate account.  Lynn Crim was the head of Allstate's claims department and supervisor to George Riley, a manager in the claims department.  Between 1987 and December 1990, Crim spoke with Nancy Gleason on a daily basis and spoke with Mike Dowd, the senior partner, "[r]arely."  

On August 7, 1990, Dowd paralegal Leslie Henkels met with Judy Gleason (an attorney at Dowd and wife of Douglas Shreffler), Nancy Gleason (an attorney and niece of principal partner Mike Dowd), and Maureen Henegan (a Dowd secretary).  During that meeting, Judy Gleason indicated that Patrick Dowd (son of Mike Dowd
(footnote: 2)) was being promoted to partnership status and that she and the others were leaving the firm.  On or about September 25, there was a partners meeting and Patrick's appointment was announced.  Following the appointment of Patrick Dowd to partner, Nancy Gleason, Douglas Shreffler and Judith Gleason began investigating the possibility of establishing a new, separate law firm.  They decided to take preliminary steps to form that firm and by December 1990, GMS had located office space, ordered furniture and equipment and initiated a banking relationship with the Harris Bank.  

On December 31, 1990, Nancy Gleason and Shreffler resigned from Dowd and with Philip McGuire and Judith Gleason, started the GMS law firm.  On December 31, 1990, Nancy Gleason and Shreffler went to Mike Dowd's home "in the late morning" to inform him of their resignations as officers and directors of Dowd.  Crim of Allstate gave Gleason the charge of moving Allstate's cases that were currently with Dowd to the new firm.  Crim testified that he learned of Gleason's new firm on December 31, 1990, "first thing in the morning." 

PROCEDURAL HISTORY

Dowd brought this action against Gleason, Shreffler and GMS, seeking imposition of a constructive trust on the new firm's fee income, an accounting, compensatory and punitive damages for breach of fiduciary duty, breach of contract, and other theories of recovery.  Gleason and Shreffler filed a counterclaim, seeking amounts due under a stock repurchase agreement and sanctions.  The parties submitted cross-motions for summary judgment.  The trial judge denied the defendants' motion for sanctions and denied their motion for summary judgment as to Dowd's breach of a fiduciary duty count, which it certified as a question of law.  The trial judge otherwise ruled in favor of the defendants on the issues.  

Dowd appealed, and the appellate court affirmed in part and reversed in part.  
Dowd & Dowd v. Gleason
, 284 Ill. App. 3d 915, 672 N.E.2d 854 (1996).  The appellate court held that
: the trial court had authority to consider defendants' motions for summary judgment; the trial court failed to make proper findings of fact; the trial court's error in weighing the credibility of witnesses in ruling on motion for summary judgment was harmless error; complaint stated a cause of action for breach of fiduciary duty; the trial court properly dismissed the civil conspiracy claim as duplicative; the trial court properly dismissed allegations of wilful and wanton conduct as duplicative; there existed a sufficient business expectancy to support its claim for tortious interference with prospective economic advantage; defendants were not required to give 90 days' notice prior to resignation; employment contract provision prohibiting the solicitation of firm clients was void; defendants' right to have the firm buy their partnership shares upon termination was not subject to offset; and the trial court properly denied defendants' motion for sanctions. 

The defendants were granted leave to appeal by the Illinois Supreme Court.  The supreme court held that: there remained unresolved factual issues on the breach of fiduciary duty count; factual questions remained as to the tortious interference with prospective economic advantage count; defendants did not breach their employment contract; noncompetition covenants in the employment agreements were unenforceable as violations of Rule 5.6 of the Rules of Professional Conduct (134 Ill. 2d R. 5.6); the civil conspiracy claim was improperly dismissed as duplicative and Dowd may plead and attempt to prove the separate elements of civil conspiracy; and no sanctions would be imposed upon Dowd for violations of the pleadings rules.

A bench trial was had on the matters remaining.  After the close of evidence, Dowd moved to reopen its case to submit more evidence.  Over defendants' objection, the court granted the motion and heard additional evidence alleging illegal tax document alterations and bank fraud.  Defendants moved for a mistrial in November 2000.  

On February 26, 2001, the trial court entered a judgment order, finding in favor of Dowd on the following counts: count I, breach of fiduciary duty; and count III, tortious interference with prospective economic advantage.  The trial court found that Dowd failed in its burden of proof as to count VII, wilful and wanton conduct.  Further, the trial court stated "[a]s the Supreme Court held that [the] Conspiracy count simply represented an alternative theory of liability
(footnote: 3), the Court enters no judgment nor awards any damages on this Count VI." 

The trial court's amended order, dated March 12, 2001, noted that the wilful and wanton conduct count was "mooted by the Appellate Court's ruling."  There was consequently no ruling on that count and the court allowed Rule 304(a) (134 Ill. 2d R. 304(a)) language to be included in its order.  On March 13, 2001, defendants filed a notice of appeal.  On April 10, 2001, Dowd filed a notice of cross-appeal requesting that this court reverse certain portions of the amended order dated March 12, 2001, by entering judgment in favor of plaintiff on the civil conspiracy count or granting a new trial on that count.

ANALYSIS

I. STATUS OF CLIENTS

Defendants' initial contention is that the trial court's reasoning in the breach of fiduciary duty section of its order essentially reduces the status of clients to chattel and the decision deprives clients of their choice of counsel by prohibiting the mobility of lawyers.  A full reading of the court's written order shows that defendants' assertion is an overstatement of the court's findings and an exaggeration of the impact of those findings.  

In its written order, the trial court discussed the broad guidelines regarding the standards and obligations used to determine whether a departing partner's actions prior to leaving a firm constitute a breach of fiduciary duty.  In citing an article from the Michigan Bar Journal (A. Goetz, 
Break Away Lawyers
, 77 Mich. B.J. 1078 (1998)), the trial court noted that when attorneys leave a law firm to establish their own firm, it is appropriate to consider the clients as property of the firm and not property of the individual members of the firm.  The trial court went on to explain that, accordingly, the lawyers may not solicit the firm's clients on company time nor may they use the firm's resources to establish their own, competing firm, particularly until proper notice has been given.  While defendants were free to set up a new law firm, the question became whether any of the steps taken in connection with such action breached the fiduciary duty that the defendants owed to Dowd.  On the other hand, the current firm has a duty not to interfere with the departing attorneys' continued right to practice law.  The trial court noted that it is not improper for the lawyer to notify the client of his impending departure provided that he makes it clear that legal representation is the client's choice.  In our view, the court's discussion encourages departing attorneys to give clients an informed choice as to who will manage their business in light of changes in employment or business structure.  The court's order also reminds current firms to allow attorneys to move freely without hindrance from them.

In fact, the supreme court noted in its review of this matter that the case law supports the view that while lawyers who are planning to leave a firm may take preliminary, logical steps of obtaining office space and supplies, they may not solicit clients for their new venture.  
Dowd
, 181 Ill. 2d at 475, citing 
Graubard Mollen Dannett & Horowitz v. Moskovitz
, 86 N.Y.2d 112, 119-20, 653 N.E.2d 1179, 1183, 629 N.Y.S.2d 1009, 1013 (1995).  The 
Graubard
 court noted: 

"'[A]s a matter of principle, preresignation surreptitious "solicitation" of firm clients for a partner's personal gain *** is actionable.  Such conduct exceeds what is necessary to protect the important value of client freedom of choice in legal representation, and thoroughly undermines another important value-the loyalty owed partners (including law partners), which distinguishes partnerships (including law partnerships) from bazaars.'"  
Dowd
, 181 Ill. 2d at 475, quoting 
Graubard
, 86 N.Y.2d at 119-20, 653 N.E.2d at 1183, 629 N.Y.S.2d at 1013.

Defendants here rely on 
Corti v. Fleisher
, 93 Ill. App. 3d 517, 471 N.E.2d 764 (1981), an inapposite case, for the proposition that clients may not be reduced to chattel.  The appellate court in 
Corti
 held that the employment agreement there, which  provided for the transfer of client files from defendants to plaintiff without permission from clients, was void and contrary to public policy in that it deprived clients of the right to be represented by counsel of their own choice.  
Corti
, 93 Ill. App. 3d at 522.  The 
Corti
 case is inapposite because that case dealt with a written agreement to transfer clients' files without permission from clients.  In the instant case, there is no such agreement, oral or written.  Here, we are dealing with the alleged improper solicitation of Dowd's largest client and the duty defendants owed to their former firm.

We are by no means asserting that clients of a law firm are the property of the firm in terms of "chattel," but we are reaffirming the tenet that preresignation solicitation of firm clients for a partner's personal gain is a breach of the partner's fiduciary duty to the firm. 

II. BREACH OF FIDUCIARY DUTY

The supreme court opinion in this case's procedural history noted that "[t]his is a fact-intensive inquiry, and on remand the finder of fact will have to resolve a number of factual disputes before determining whether the defendants breached their fiduciary duty."  
Dowd
, 181 Ill. 2d at 477.

On remand, the trial court made several findings of fact as to defendants' breach of fiduciary duty to Dowd.  Some of those findings included: failing to disclose certain facts that threatened the economic existence of Dowd, such as obtaining a $400,000 line of credit and $100,000 checking account from Harris Bank using Dowd's confidential information; paying down more than $186,000 of Dowd's line of credit to American National Bank without authorization, in order to present a better financial statement for themselves when obtaining a line of credit for GMS; soliciting Allstate's business prior to resigning from Dowd; arranging for a mass exodus of firm employees prior to December 31, 1990; downloading Allstate case service lists and mailing labels for substitution of counsel; and using of confidential information.  

 Our standard of review is whether the trial court's findings of breach of fiduciary duty are against the manifest weight of the evidence.  See 
Howard v. Zack Co.
, 264 Ill. App. 3d 1012, 1024, 637 N.E.3d 1183 (1994) (factual determinations will not be overturned unless they are against the manifest weight of the evidence).  "Manifest weight" means a level of proof that leads to a result that is "clearly evident, clear, plain and indisputable."  
Laroia v. Reuben
, 137 Ill. App. 3d 942, 946, 485 N.E.2d 496 (1985).  A judge's findings of fact are "not against the manifest weight of the evidence merely because the record might support a contrary decision."  
Graham v. Mimms
, 111 Ill. App. 3d 751, 767, 444 N.E.2d 549 (1982).  Because defendants vehemently contest the finding as to pretermination solicitation, we will address that issue first.  

A. Pretermination Solicitation

One of the major questions in this case was whether defendants solicited Allstate as a client for their new firm before they left Dowd, thereby breaching their fiduciary duty to the firm.  Defendants assert that Dowd's proof of solicitation was based on allegations of obtaining office space, credit, and equipment and using Dowd resources, all of which the Illinois Supreme Court has already deemed proper. 

 The trial court in the instant case observed that in Illinois, the breach of fiduciary duty among law partners has often been examined in connection with business partners.  For instance, in 
Dowell v. Bitner
, 273 Ill. App. 3d 681, 691, 652 N.E.2d 1372 (1995), the appellate court there noted that "employees may plan, form and outfit a competing corporation while still working for the employer, but they may not commence competition."  (Emphasis is omitted.)  Further, former employees may compete with their former corporate employer and solicit former customers as long as there was no business activity prior to termination of employment.  
Dowell
, 273 Ill. App. 3d at 691.  Although the Illinois Supreme Court pointed out that lawyers are not bound by the same fiduciary duties as those of nonlawyer corporate officers and directors (
Dowd
, 181 Ill. 2d at 471), the principles are similar.  In its review of this case, the supreme court found the following comments from 
Graubard
, a New York Court of Appeals case, relevant: secretly attempting to lure firm clients to the new association, lying to partners about plans to leave, and abandoning the firm on short notice and taking clients and files would not be consistent with a partner's fiduciary duties.  
Dowd
, 181 Ill. 2d at 476, quoting 
Graubard
, 86 N.Y.2d at 120-21, 653 N.E.2d at 1183-84, 629 N.Y.S.2d at 1013-14.  

One item of evidence that supports a finding of breach of fiduciary duty based on pretermination solicitation in this case is Leslie Henkels' testimony.  Henkels, a former legal assistant/paralegal at Dowd, testified that she was told in mid-December 1990 by Nancy Gleason that GMS had secured the Allstate business for the new firm.  The trial court found her testimony to be credible.  Ultimately, it is for the trial judge to determine the credibility of the witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidentiary record.  
Williams v. Cahill
, 258 Ill. App. 3d 822, 825, 629 N.E.2d 1175 (1994).

The trial court also relied on the testimony of Leslie Henkels regarding the events of December 31, 1990.  Henkels testified that on December 31, 1990, shortly before noon, Nancy Gleason called her and told her that she was faxing a letter to her to be put on the desks of the partners at Dowd.  Henkels recalled that the letter was on Allstate letterhead and signed by George Riley.  Nancy Gleason called back shortly thereafter and told Henkels to retrieve the faxes and destroy them, on the advice of "their counsel."  Nancy then called a third time indicating that she was on her way to Mike Dowd's house to resign.  The time between the first call and the third call was approximately 30 to 45 minutes.  When shown Nancy Gleason's resignation letter at trial, Henkels stated that the letter was not the document she received via fax from Nancy and had not seen it before. 

In contrast, Nancy Gleason testified that she told Henkels that she was sending a fax, but testified that it was not a fax from Allstate.  She stated that it was her letter of resignation.  Nancy testified that after speaking with Mike Dowd on December 31, 1990, she proceeded to the Allstate offices.  Nancy Gleason recalled telling Crim and Riley that a new firm was being formed and certain associates would be extended offers.

The trial court expressly believed Henkels version of the December 31 events, including the content of the letter, and we will not disturb such a finding of credibility.  See 
Williams
, 258 Ill. App. 3d at 825.

Timothy Nolan, an attorney that began working for GMS in July or August 1991, testified that Virginia Vermillion, an associate at Dowd prior to December 31, who joined GMS in January 1991, told him that Nancy Gleason had George Riley's commitment long before defendants left Dowd and that "they had a lock on the business long before they left."  Nolan further testified that Vermillion told him that they were able to transfer the files so easily because, "[w]e knew which files were coming.  We knew which attorneys were coming.  We knew who was coming."

At trial, Virginia Vermillion denied telling Timothy Nolan that she knew about the new firm before January 1, 1991, or that defendants solicited the Allstate business prior to December 31.  She also testified that she did not tell William Kreese, a candidate for an associate position at Dowd, that he was actually interviewing for the new law firm. 

Another item of evidence that supports the finding of pretermination solicitation is the November 1990 credit memorandum created by David J. Varnerin, a relationship manager in the private banking group at Harris Bank.  The November 28, 1990, memorandum that Varnerin prepared for his supervisors indicated that "[d]iscussions have been held with their principal clientAllstate.  The firm has been assured that their invoices will be paid promptly within 30 days.  And, since the firm will have the prior firm's office administrator, we can reasonably assume that bills will be generated and sent in a very prompt manner."  Also in the memorandum, business reference D. Paterson Gloor told Varnerin that "Nancy Gleason's group has a real lock on the Allstate business and he believes this client relationship will last for years." 
 
The reasonable inference from Varnerin's memorandum is that defendants made contact with and solicited Allstate's business prior to resigning from Dowd.  Circumstantial evidence will suffice whenever an inference may reasonably be drawn therefrom.  
Grewe v. West Washington County Unit District No. 10
, 303 Ill. App. 3d 299, 303, 707 N.E.2d 739 (1999).  

We note that the supreme court stated in its prior opinion in this case that departing lawyers are permitted to prepare lists of clients 
expected to leave the firm
 and obtain financing based on the lists.  
Dowd
, 181 Ill. 2d at 470-71.  That expectation is distinctly different from what happened in this case, where the evidence leads to the reasonable inference that the partners actually solicited the Allstate business, secured a commitment from Allstate for future business and obtained financing based on that commitment, not a mere expectation. 

In contrast, Lynn Crim and George Riley both testified that they had not been solicited by defendant to move their business to the new firm prior to Nancy Gleason's resignation.  As stated earlier, it is for the trial judge to determine the credibility of the witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidentiary record.  
Williams
, 258 Ill. App. 3d at 825.  Thus, we affirm the court's finding that Dowd met its burden of showing that defendants breached their fiduciary duty to Dowd by soliciting Allstate prior to the termination of their employment contracts. 

B. Manner of Leaving Dowd

Although we have found that the trial court did not abuse its discretion in holding that defendants breached their fiduciary duty by committing pretermination solicitation, the evidence in the instant case also supports a finding that defendants breached their fiduciary duty in the manner in which they left Dowd.  

The court held that "voting and accepting large bonuses for themselves and their friends and family without disclosure that they would be leaving and again stripping D&D of cash reserves" was a breach of defendants' fiduciary duty to Dowd.  This was evidenced by Nancy Gleason's  testimony that she received a $62,500 bonus in October 1990 based on August 1990 discussions with the other shareholders/partners to issue bonuses and a $100,000 bonus on or about December 21, 1990, despite her plans to leave Dowd on December 31, 1990.  The evidence also demonstrated that defendants' discussions of forming the new firm also began in August 1990.  Therefore, the court's decision to include bonuses in its award to Dowd is not an abuse of discretion.  Even though we may have held differently in light of the testimony that bonuses were based, in part, on past performance and service to the firm, a reviewing court will not overturn a circuit court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact.  
In re Application of the County Treasurer
, 131 Ill. 2d 541, 549, 546 N.E.2d 506 (1989). 

The trial court here also held that defendants breached their fiduciary duty by arranging for the mass exodus of firm employees before December 31, 1990.  See 
Veco Corp. v. Babcock
, 243 Ill. App. 3d 153, 163-64, 611 N.E.2d 1054 (1993) (held that actions constituted breach of fiduciary duty where defendants secretly solicited Veco employees for new company and orchestrated a mass exodus following defendants' resignation).  This was evidenced by the matching of Dowd associates who eventually joined GMS and the furniture invoice providing the names of the persons using the new furniture created prior to defendants' resignations.  The evidence regarding the premade furniture labels leads to the reasonable inference that defendants went so far as to solicit many Dowd attorneys who worked on the Allstate files to leave Dowd prior to their resignation.  Additionally, paralegal Leslie Henkels testified that on the evening of December 31, she received a call from Judy Gleason asking her to join the firm--though it was "basically a formality since I had already been asked to join the firm months before."  The circuit court's determination is not against the manifest weight of the evidence. 

The trial court here heard ample amounts of testimony as to defendants' actions prior to their resignation and based on that testimony and its credibility assessments, the court determined that the manner in which defendants left Dowd was improper and a breach of their fiduciary duty.  We will not disturb those determinations.  A reviewing court may not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion.  
Howard
, 264 Ill. App. 3d at 1024.  

Defendants here also contend that the trial court's finding that defendants were competing with Dowd "in their own minds" before resignation has no support in the record.  Defendants are referring to the portion of the trial court's written order that stated:

"***The evidence shows that 
in their own minds
, the firm of GMS was in business prior to the date of resignation as shown from the employer identification number application (11-1-90) (Pl.'s Ex. 2) and the Professional Liability Insurance Policy Declarations effective 12/1/90, which listed 14 D & D employees for GMS (Pl.'s Ex. 108 a.k.a. Def.'s Ex. 90), as well as the revenue projections to Harris Bank."  (Emphasis added.)  

The December 1, 1990, start date for GMS's professional liability insurance, compared to defendants' December 31, 1990, actual resignation date, supports the trial court's finding.  Even if this finding was not supported by the record, as a reviewing court, we can sustain the decision of a lower court on any grounds that are called for by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct.  
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 97, 658 N.E.2d 450 (1995). Here, we have already affirmed the trial court's finding that defendants breached their fiduciary duty to Dowd by soliciting Allstate's business prior to their resignation and the trial court's breach of fiduciary duty decision may stand on that finding alone. 

C. Use of Confidential Information

Defendants also assert that the court's finding as to the use of confidential information is "flatly contradicted" by the record and the court never identifies what was considered "confidential information."  The trial court, however, specifically states that it was a breach of fiduciary duty when "Nancy Gleason and Douglas Shreffler breached the agreement not to use confidential information, time and billing information and information from the financial statements of D&D for their own personal gain."  In its order, the trial court cites the testimony of Maureen Gleason as evidence of defendants' use of confidential information.  In Illinois, the law is well established that the trial judge, sitting without a jury, has the obligation of weighing the evidence and making findings of fact. 
Chicago Investment Corp. v. Dolins
, 107 Ill. 2d 120, 124, 481 N.E.2d 712 (1985).  An appellate court will defer to the findings of the trial court unless they are against the manifest weight of the evidence.  
Dolins
, 107 Ill. 2d at 124.

Maureen Gleason testified, as an adverse witness, that in late October 1990 she and her husband prepared a projected profit and loss statement
(footnote: 4) for the new firm, with a start date of November 1990.  It was prepared for submission to three banks, including Harris Bank.  Maureen said that the unspecified associates listed therein were based on a projection of the number of associates GMS needed "to handle the business that [they] hoped to get," but no specific associates were in mind.  She stated that the estimated 2,250 billable hours per associate was based on the average expectancy at law firms.  She explained that the experience level and billable hours expectancy descriptions of the unspecified associates was based on who they "hope[d] to bring with [them] if [they] left."  Though she had access to confidential information like this, Maureen denied using Dowd's confidential information to obtain GMS' projected figures.  Maureen testified that the figures were based upon numerous publications that indicated what was the accepted amount of billable hours for associates.  

The trial court believed that confidential information was in fact used to defendants' benefit in creating this projection.  However, the Illinois Supreme Court stated in its prior opinion in this case that departing lawyers are permitted to prepare lists of clients expected to leave the firm and obtain financing based on the lists.  
Dowd
, 181 Ill. 2d at 471.  
Therefore, the trial court's finding is in error.  Nonetheless, the finding of breach of fiduciary duty is supported on other grounds and does not change the outcome of this case.

The court also found that it was an improper use of confidential information for defendants to make payments to Dowd's line of credit with American National Bank to secure its own line of credit without authorization to do so.  Defendants assert that David Varnerin, Dowd's witness, obviated such a claim and thus, the court's decision is unfounded.  Varnerin testified that in considering the application for a line of credit with Harris Bank, he did not inquire as to whether Dowd's line of credit obligation had been paid off and affirmed that the decision to approve defendants' line of credit was independent of that obligation.  However, Kenneth Gurber, a nondeparting partner at Dowd, testified that under normal circumstances, he would have been consulted about the American National Bank payoff, but was not, and Maureen Gleason did not have the authority to write a check for $187,000 without approval from the board of directors.  Because credibility and conflicts in testimony are for the fact finder to determine (
Gordon v. Dolin
, 105 Ill. App. 3d 319, 326, 434 N.E.2d 3411 (1982)), we leave the credibility assessment at the discretion of the trial court.  The court was in the best position to determine whether it believed that Varnerin used the payoff information in his evaluation.  Regardless of whether the court considered the payoff, the evidence demonstrates that defendants used confidential information and covert action to pay off this line of credit.  As guarantors of Dowd's line of credit, paying the sum off would make them more attractive to Harris Bank officials in the position to extend a line of credit to them for the new firm. 

There was also ample evidence of defendants' use of Dowd confidential records in preparation for taking Allstate with them to the new firm.  Leslie Henkels testified that between August 1990 and December 31, 1990, she was directed by either Judy Gleason, Maureen Gleason or Maureen Heneghan to update the service lists in order to move the Allstate business to GMS.  On December 28, 1990, Henkels made sure that the service lists were up to date and the mailings lists were with them so that they could notify counsel of substitution of attorney.  On December 31, 1990, between 2 p.m. and 3 p.m., Henkels took the service list binders to GMS's offices, at the instruction of Doug Shreffler.  

Mary Judson, a former Dowd legal secretary, testified that on December 28, 1990, prior to defendants' resignations, she was instructed by Leslie Henkels and Maureen Henegan to update and download the Allstate service lists and mailing labels to disks.  She was told that the project had to be completed that day.

In contrast, Maureen Henegan (Nancy Gleason's secretary at Dowd and GMS) testified that she did not instruct anyone at Dowd to update service lists so that they may taken to the new firm.  In light of the conflicting testimony, we will not disturb the fact finder's decision as to the credibility of these witnesses.  
Kalata v. Anheuser-Busch Co.
, 144 Ill. 2d 425, 433, 581 N.E.2d656 (1991).  Moreover, the court's finding of use of confidential information is well supported by the record.

III.  TORTIOUS INTERFERENCE

In focusing on the conduct of the defendants, the trial court here determined that Dowd proved defendants' actions constituted tortious interference with a prospective economic advantage.  We agree, as shown below in our discussion of each element.  Defendants, however, assert that the trial court's personal assertions of business expectations prejudiced their case and, further, that the trial court had no evidence that Dowd had a valid business expectation that they would be the recipient of Allstate's business after Nancy Gleason's departure.

To establish a cause of action for the tort of intentional interference with a prospective economic advantage, Illinois law requires that the following four elements must be proven: (1) the existence of a valid business relationship or expectancy; (2) the defendants' knowledge of plaintiff's relationship or expectancy; (3) purposeful interference by the defendants that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship or termination of the relationship; and (4) damages to plaintiff resulting from such interference.  
Fellhauer v. City of Geneva
, 142 Ill. 2d 495, 511, 568 N.E.2d 870 (1991).

A. Existence of a Valid Business Relationship or Expectancy

Defendants contend that Dowd did not offer any evidence that

it had an expectancy to keep Allstate's business after the departure of Gleason and reminds this court that the relationship between an attorney and his client is terminable at will.  See
 Grund v. Donegan
, 298 Ill. App. 3d 1034, 1038, 700 N.E.2d 157 (1998).  While this is true, until terminated, the relationship created by an at-will contract will presumptively continue in effect so long as the parties are satisfied, and, therefore, such a relationship is sufficient to support an action for tortious interference.  
Grund
, 298 Ill. App. 3d at 1038. 

The fact that the relationship between an attorney and her client is terminable at will does not of itself defeat an action for tortious interference because the action is not dependent upon an enforceable contract but, rather, upon an existing relationship.  
La Rocco v. Bakwin
, 108 Ill. App. 3d 723, 731, 439 N.E.2d 537 (1982).  Until terminated, the relationship created by a contract terminable at will is subsisting and will presumptively continue in effect so long as the parties are satisfied.  
Anderson v. Anchor Organization for Health Maintenance
, 274 Ill. App. 3d 1001, 1013, 654 N.E.2d 675 (1995).  Such a relationship is sufficient to support an action for tortious interference.  See 
Kemper v. Worcester
, 106 Ill. App. 3d 121, 125, 435 N.E.2d 827 (1982).

The focus here is not on the conduct of the client in terminating the relationship, but on the conduct of the party inducing the breach or interfering with the expectancy.  
Dowd
,
 
181 Ill. 2d at 484.  Moreover, to prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but "'purposeful interference,'" meaning the defendant has committed some impropriety in doing so.  
Dowd
, 181 Ill. 2d at 485, quoting Restatement (Second) of Torts § 766B, Comment a (1979) ("'In order for the actor to be held liable, this Section requires that his interference be improper'"). 

   Defendants assert that the trial court had no evidence that Dowd had a valid business expectation that it would be the recipient of Allstate's business after Nancy Gleason's departure. They complain that following Dowd's objection during trial, George Riley from Allstate was not allowed to testify that the 200 files handled by Nancy Gleason at Dowd would have gone with her had she been fired by Dowd.  We first note that a trial court's ruling on an objection to evidence will not be reversed absent an abuse of discretion.  
Progress Printing Corp. v. Jane Byrne Political Committee
, 235 Ill. App. 3d 292, 304, 601 N.E.2d 1055 (1992). 

The question posed to Riley during trial was: "If Mike Dowd had fired Nancy Gleason in 1990, would you have left the files that she was working on for you with Mike Dowd?"  Following an objection, the court stated that the answer would call for speculation.  Defense counsel argued that it spoke to the "missing gap" in Dowd's reasonable expectation issue.  The court then allowed counsel to ask a series of questions of Riley as an offer of proof.  Riley was asked what effect Nancy Gleason's termination would have had on the handling of Allstate's files.  Riley responded, "Disaster," because "Nancy was an integral part of this operation."  Riley was also asked if he would have  allowed the 200 Allstate files to remain at Dowd absent Nancy Gleason, to which he answered, "No."

Riley's answers, in defendants' view, would support the conclusion that Dowd did not have a legitimate expectancy of continued business in the event that Gleason left Dowd.  We find it important that there was no evidence that Dowd had any indication from Riley prior to December 31, 1990, that its continued business relationship was dependent upon Nancy Gleason's continued employment with Dowd.  Even if Dowd had that understanding, Dowd was unaware of Nancy Gleason's intention to leave the firm.  There was also no indication that Allstate was in any way dissatisfied with the services received from Dowd.  More importantly, as we have already affirmed the finding that defendants succeeded in ending the relationship, their "purposeful interference" was committed in an unseemly manner.  In our view, the trial court's order does not offend the well- established rule that a client may discharge an attorney at any time, for any reason, or for no reason.  See 
Balla v. Gambro, Inc.
, 145 Ill. 2d 492, 584 N.E.2d 104 (1991).   

B. Knowledge of Plaintiff's Relationship or Expectancy

Dowd enjoyed a 15-year business relationship with Allstate.  As partners and shareholders, defendants were undeniably aware of this relationship and its lucrative benefit to Dowd.

C. Purposeful Interference

Support for the trial court's purposeful-interference finding is found within the breach of fiduciary duty discussion of this opinion.  Defendant's actions, or "impropriety" as the trial court put it, established a purposeful interference with Dowd's prospective economic advantage.  The reasonable inference from the evidence discussed earlier and the court's credibility findings demonstrate that defendants covertly solicited the Allstate account prior to terminating their employment with Dowd.  The covert steps taken by Nancy Gleason, Shreffler and GMS, individually and collectively, seemingly caused Dowd's largest client to make a commitment to cease doing business with Dowd.  Defendants' actions, in the trial court's view, prevented Dowd from enjoying a continuing relationship with Allstate and, more importantly, precluded Allstate from having a free and unfettered choice regarding keeping its business with Dowd.  Cases have recognized that pretermination solicitation of clients by members of an existing firm for the benefit of a new firm rises to a breach of a fiduciary duty.  
Dowd
, 181 Ill. 2d at 474, citing 
Vowell & Meelheim, P.C. v. Beddow, Erben & Bowen, P.A.
, 679 So. 2d 637, 639 (Ala. 1996) and 
In re Silverberg
, 81 A.D.2d 640, 641, 438 N.Y.S.2d 143, 144 (1981).  

There was no evidence introduced, for example, that Dowd was given any time to attempt to salvage its long-standing business relationship. If given the opportunity, Allstate may have remained with Dowd if offered more attractive fee arrangements (no fees for research, no second chairs at trial, and lower hourly rates are usually accorded government bodies).  The latter, in the long run, might have proven more appealing to this insurer than simply having only Gleason in charge of their files.  However, due to the secretiveness and abruptness of defendants' ultimate departure, the securing of the Allstate business was a feat accomplished at least by January 1, if not months earlier as the trial court believed.  This alone represents some interference with Dowd's legitimate business expectation vis-a- 
vis
 Allstate and more importantly, casts doubt on how free and unfettered Allstate's decision to leave Dowd really was, absent a viable and familiar alternative (continuing to do business with Dowd at more advantageous terms).  It also renders the pronouncements of Riley and Crim, as the trial court said, closer to speculation than fact, as they insist. 

Defendants contend that the trial court ignored the testimony of the Allstate representatives, Crim and Riley, that they were not aware of the new firm prior to December 31 and unjustifiably credited the conflicting testimony of former Dowd paralegal Leslie Henkels that she was told that defendants had secured Allstate's commitment prior to December 31.  Defendants also disagreed with the court's reliance on GMS associate Timothy Nolan's testimony that Virginia Vermillion told him that Allstate's commitment was secured before defendants' resignations.  However, these contentions are based on credibility assessments.  Absent a showing of an abuse of its discretion, we will not reverse a trial court's determination on the issue.  See 
Williams
, 258 Ill. App. 3d at 825.

Moreover, we hold that the trial court's purposeful- interference finding is supported by the evidence and the reasonable inferences therefrom.  See 
Grewe
, 303 Ill. App. 3d at 303.

D. Damages

1. Compensatory Damages

Defendants also assert that because Riley from Allstate testified that Allstate would have followed Gleason in any event there can be no damages.  
A plaintiff must prove damages to a reasonable degree of certainty, and evidence cannot be remote, speculative, or uncertain.  
In re Estate of Halas
, 209 Ill. App. 3d 333, 349, 568 N.E.2d 170 (1991);  
First National Bank v. Dusold
, 180 Ill. App. 3d 714, 718, 536 N.E.2d 100 (1989).  The trial court specifically held that "Plaintiff has proved damages with a reasonable degree of certainty.
"  Even when the appellate court would have been better satisfied with different findings, we generally will not interfere with a trial court award supported by the evidence.  
Pioneer Trust & Savings Bank v. Zonta
, 96 Ill. App. 3d 339, 345, 421 N.E.2d 239 (1981). 

Here, the compensatory damages award against Nancy Gleason, Douglas Shreffler and GMS for count III (tortious interference with prospective economic advantage) in the amount of $2,464,889.46, was based on the evidence presented by Dowd's damages opinion witness, Todd Lundy.  Lundy is a certified public accountant.  The trial court specifically found that the evidence presented by Lundy, including his report, established certain damages.  In preparing his report, Lundy testified that he read the pleadings, depositions, various financial documents from Dowd (such as paid bills, records of invoice collections) and some tax returns of GMS.  His opinions were generally categorized as compensation and bonus-related damages, out-of-pocket damages and lost profit.  The damage period was calculated beginning August 7, 1990, based on Leslie Henkels' testimony that on that date some of the defendants discussed their plan to leave Dowd.  He noted that there was some dispute as to when the damage period was to begin (August 7 or September 25), so some calculations were computed based on both dates and listed separately.
  Lundy testified in detail as to the amounts he calculated and the supporting information for those amounts.  

For instance, Lundy testified that it was his opinion that the total damages incurred in this case amounted to $2,591,605.54.  Lundy determined that the compensation and bonus-related monies issued to Nancy Gleason, Maureen Gleason, Douglas Shreffler and Judith Gleason totaled $440,274.  The lost profits totaled $871,199.75.  Lundy testified that he used a two-year period for the lost profits because of the manner in which law firms perform their accounting and because the information provided to Harris Bank by defendants for GMS's line of credit included a two-year projection.  Lundy's calculations also included, but are not limited to, the following: Gleason and Shreffler's salaries for the period August 7, 1990, to December 31, 1990, totaling $110,999.89; a $9,719.81 construction expense in Dowd's sublease; $5,817.35 for the reinsurance conference held in Bermuda in November 1990 attended by, among others, Virginia Vermillion, Nancy Gleason, and Allstate's Riley; $5,624 Allstate lawyers' section Christmas party; total compensation, bonus-related and out-of-pocket damages in the amount of $849,206.04; and $871,199.75 in lost profit damages for years' end December 31, 1991, and December 31, 1992. 

The court held that the damages, as a result of defendants' breach of fiduciary duty and tortious interference with prospective economic advantage, totaled $2,464,889.46.  This was based on the total compensation/bonus payments and out-of-pocket damages of $812,859.90 incurred between August 7, 1990, to December 31, 1992, minus salaries and bonuses paid to nonparties Judy Gleason and Maureen Gleason, plus two years of lost profits.  The court did not include the costs of the trip to Bermuda or the Allstate lawyers' section Christmas party because "there is no way to determine whether or not the GMS firm benefitted from those matters, or if Plaintiff would have had them in any event, even if it had known that Gleason was leaving."  

The assessment of damages by a trial court sitting without a jury will not be set aside unless it is manifestly erroneous.  
Vendo Co. v. Stoner
, 58 Ill. 2d 289, 311, 321 N.E.2d 1 (1974).   In the instant case, the damages award is based on the detailed testimony and exhibits provided by Dowd's expert witness.  The forfeiture of salary represented a period of time beginning with the breach of defendants' fiduciary duty and ends with an allowance of damages for Dowd's lost profits for a two-year period.  Illinois law permits a complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation.  
Levy v. Markal Sales Corp.
, 268 Ill. App. 3d 355, 373, 643 N.E.2d 1206 (1994) (case did not involve attorneys, but is nonetheless instructive).  Though there was no indication that defendants did not work at the efficiency level or with the diligence that they had prior to deciding to leave Dowd, they cannot claim a right to retain the compensation earned while breaching their fiduciary duty to Dowd.  
Veco Corp. V. Babcock
, 243 Ill. App. 3d 153, 165, 611 N.E.2d 1054 (1993).
 

Defendants next assert that the trial court erroneously required the forfeiture of bonuses Gleason
(footnote: 5) received as a part of her compensation prior to her resignation because all partners agreed sometime in August 1990 to issue bonuses and all partners received bonuses.  

Ken Gurber, a nondeparting partner at Dowd, testified that bonuses were paid for past performance and service to the firm, based on individuals' performance history and work that was done that year.  Gurber also testified that the amounts were tied to the amount of income that the firm had during the year and were an inducement for future performance and to keep qualified individuals at the firm.  He testified that the pay out of bonuses left the firm "cash poor."  Bob Yelton, another nondeparting partner, testified that bonuses were predicated upon past performance and an inducement for future performance.  Even Michael Dowd, by way of deposition, testified that in 1990, year-end bonuses were distributed because they "made some money" and they "had some to distribute."  The idea that Mike Dowd would not have approved bonuses had he known that defendants were intending to leave and form their own firm has no bearing on the fact that the bonuses were approved based, at least in part, on past performance. 

Although the bonuses were based in part on work performed antecedent to the period of breach (established here as beginning on August 7, 1990), they were properly included in the damages award in that the departing partners had already contemplated and discussed leaving the firm by the time the bonuses were voted upon.  Nonetheless, they did not notify the firm of their intentions until after both bonuses had been issued.  Because the bonuses issued here appear to be based on both past performance and as an inducement to perform well in the future, we cannot say that it was an abuse of discretion for defendants to have to forfeit those amounts.  In our view, similar to the appropriateness of forfeiting salaries for the period of the breach of one's fiduciary duty, the forfeiture of bonuses during that same period may be included in the damages calculation if supported by the record.  Moreover, the trial court held that Dowd proved damages with a reasonable degree of certainty, and based on the evidence, we cannot say that the holding was manifestly erroneous.  See 
Vendo
, 58 Ill. 2d at 311.

Defendants further postulate that the damages improperly reflect fees generated by work done on files that were opened at Dowd and transferred to GMS and fees on every new assignment given to Gleason at her new firm in 1991 and 1992.  In defendants's view, the trial court's decision and award of damages "effectively negates Rules 1.5 and 5.6 of the Rules of Professional Conduct as promulgated by the Supreme Court."  

Rule 1.5 of the Rules of Professional Conduct (134 Ill. 2d R. 1.5(f)) states that a lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a disclosure.  Rule 5.6 (134 Ill. 2d R. 5.6) provides that a lawyer shall not participate in offering or making a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement, or an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.  

We do not believe that the court's ruling for damages violates either of these rules of professional conduct, as the court did not include fees for services rendered in 1991 and 1992 at GMS, but for 
profits
 that resulted from their misconduct. 

A "fee" is defined as a "charge for labor or services, esp. professional services" (Black's Law Dictionary 629 (7th ed. 1999)) and fee-splitting is "[t]he division of attorney's fees between the lawyer who handles a matter and the lawyer who referred the matter" (Black's Law Dictionary 631 (7th ed. 1999)).  A profit is defined as "the excess of revenues over expenditure in a business transaction."  Black's Law Dictionary 1226 (7th ed. 1999).  This case involves a breach of fiduciary duty, and the law clearly states that a defendant should not be permitted to retain any profits from such a breach.  
Regnery v. Meyers
, 287 Ill. App. 3d 354, 365, 679 N.E.2d 74 (1997).  

Generally, a plaintiff must present competent proof of lost profits from which a reasonable basis of computation can be derived.  
Nordhem v. Harry's Cafe, Inc.
, 175 Ill. App. 3d 392, 396, 529 N.E.2d 988 (1988).  Since lost profits are determined by many factors, it must be shown with a reasonable degree of certainty that defendants breached caused a specific portion of the lost profits.  
Midland Hotel Corp. v. Reuben H. Donnelly Corp.
, 118 Ill. 2d 306, 316, 515 N.E.2d 61 (1987).  Here, plaintiffs' expert provided a report and explanation of how he arrived at the lost profits included in his damages opinion.  The inclusion of lost profits represents the monies Dowd would have earned had Allstate remained with the firm.  The trial court found the exhibit and accompanying testimony to be calculated to a reasonable degree of certainty and defendants do not even raise such an issue. 

2. Punitive Damages

Defendants next assert that the trial court's punitive damages should be reversed because the court's ruling was favorable to Dowd even though Dowd "never proved the amounts on which the court based its judgment or that a specific defendant was responsible for a specific element of the claimed damages."  

There is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of plaintiff's compensatory recovery.  
Deal v. Byford
, 127 Ill. 2d 192, 204, 537 N.E.2d 267 (1989).  The purpose of punitive damages is to punish defendants and to deter others from the same conduct; they should be awarded only in aggravated circumstances involving fraud, willfulness, wantonness or malice.  
Petty v. Chrysler
, 343 Ill. App. 3d 815, 828, 799 N.E.2d 432 (2003).  Punitive damages are allowable where the wrong involves some violation of a duty arising from the relationship of trust and confidence.  
Home Savings & Loan Ass'n v. Schneider
, 108 Ill. 2d 277, 284, 483 N.E.2d 1225 (1985), quoting 
Laughlin v. Hopkinson
, 292 Ill. 80, 89, 126 N.E. 591 (1920).  Similarly, punitive damages are appropriate to punish and deter conduct where the defendant is guilty of an intentional breach of fiduciary duty.  
Citicorp Savings v. Rucker
, 295 Ill. App. 3d 801, 810-11, 692 N.E.2d 1319 (1998).   Whether to award punitive damages is an issue that we leave at the sound discretion of the trial court, which decision will not be disturbed absent an abuse of discretion.  
Levy v. Markal Sales Corp.
, 268 Ill. App. 3d 355, 379, 643 N.E.2d 1206 (1994). 

The trial court here reasoned that the appropriate punitive damage award in this case is $200,000 against Gleason and Shreffler, individually.  The court reasoned that the actions of Gleason and Shreffler were intentional and in deliberate disregard of the fiduciary relationship existing between Dowd and defendants.  The court concluded that defendants' conduct "was not only secretive, but it was malicious."  The court also noted that defendants "took a client" and valuable confidential firm information, including mailing lists, service lists and firm reference books and updated them for their own personal use.  Notably, the court declined to award attorney fees absent any guiding authority to do so.  Based on the court's reasoning and the evidence provided at trial, we cannot say that the court's punitive damages ruling was an abuse of its discretion.  

We, therefore, affirm the damages award of the trial court.

IV. MOTION FOR MISTRIAL

Defendants assert that they should have been granted a mistrial for several reasons.  The decision to grant a mistrial rests within the sound discretion of the trial court based upon the particular circumstances of the case.  
Juarez v. Commonwealth Medical Associates
, 318 Ill. App. 3d 380, 385, 742 N.E.2d 386 (2000).  The trial court's ruling will not be disturbed on appellate review absent a clear abuse of discretion.  
Juarez
, 318 Ill. App. 3d at 385.  

Defendants initially draw our attention to Dowd's assertion in its opening statement that there would be evidence that a Dowd interviewee was recruited for GMS.  Although the Dowd interviewee was identified as a witness who would testify that he was told by Virginia Vermillion that he was being interviewed for GMS, he was not called at trial.  Nonetheless, Virginia Vermillion denied speaking to the interviewee about joining the new firm.  

The comments made by an attorney in an opening statement concerning evidence to be introduced at trial are not improper if made in good faith and with reasonable belief that the evidence is admissible, although the intended proof referred to is later excluded.  
Yedor v. Centre Properties, Inc.
, 173 Ill.  App. 3d 132, 144, 527 N.E.2d 414 (1988); 
Hilgenberg v. Kazan
, 305 Ill. App. 3d 197, 210, 711 N.E.2d 1160 (1999).  Moreover, similar to jury trials, opening statements in a bench trial are not evidence.  See 
Nassar v. County of Cook
, 333 Ill. App. 3d 289, 304-05, 775 N.E.2d 154 (2002).  In a bench trial, in the absence of evidence to the contrary, it is presumed that the court considers only competent evidence and the admission of incompetent evidence is harmless.  
In re Application of the County Collector for Judgment & Sale Against Lands & Lots Returned Delinquent for Nonpayment of General Taxes and/or Assessments for the Year 1985 and Prior Years
, 219 Ill. App. 3d 396, 405, 579 N.E.2d 936 (1991).

Defendants next argue that the line-of-credit evidence was irrelevant and therefore requires a mistrial.  The determination of the relevancy of evidence is largely within the discretion of the trial court, and reversal of its decision is not warranted absent abuse of that discretion.  
O'Brien v. Hertl
, 238 Ill. App. 3d 217, 223, 606 N.E.2d 225 (1992).  Kenneth Gurber's testimony that he was not consulted regarding the line-of-credit payoff and that Maureen Gleason did not have the authority to write a check for $187,000 without approval from the board of directors is relevant as evidence of defendants' improper use of confidential information and acting for their own interest to the detriment of their other partners.  Nancy Gleason's October 1990 financial statement provided that she was a guarantor on Dowd's line of credit at American Bank that had $184,999 outstanding, but it was expected to be paid in full in two weeks.  Judy Gleason's financial statement to Harris Bank indicated that she was a co-signer on Dowd's line of credit and it would have a zero balance in the immediate future.  Shreffler's financial statement also indicated that the Dowd line of credit would have a zero balance in the near future.  As a guarantor of Dowd's line of credit, anyone paying off that outstanding balance would create a more attractive credit situation, which would enable him or her to secure the Harris Bank line of credit for the new firm.  This is so, despite Varnerin's statement that he did not consider the payoff in granting the line of credit. 

Defendants further contend that the trial court's consideration of the evidence at the reopened evidence hearings necessitates a mistrial.  In rendering its decision, the trial court should consider whether the moving party has provided a reasonable excuse for failing to submit the additional evidence during trial, whether granting the motion would result in surprise or unfair prejudice to the opposing party, and if the evidence is of the utmost importance to the movant's case.  
In re Marriage of Weinstein
, 128 Ill. App. 3d 234, 248-49, 470 N.E.2d 551 (1984).  The decision of whether to reopen proofs is in the sound discretion of the trial court.  See 
Chicago Transparent Products, Inc. v. American National Bank & Trust Co.
, 337 Ill. App. 3d 931, 942, 788 N.E.2d 23 (2002).  Further, in a bench trial, we presume that the trial court considered only the properly presented evidence in making its decision.  
Wildman, Harrold, Allen & Dixon v. Gaylord
, 317 Ill. App. 3d 590, 597, 740 N.E.2d 501 (2000). 

The evidence presented at the hearing included two versions of GMS's 1991 tax return.  Dowd hoped to damage the credibility of defendants' witnesses by proving that the documents had been illegally altered in some way.  Further, it was brought to the court's attention that an Attorney Registration and Disciplinary Commission (ARDC) proceeding was had regarding Nancy Gleason and the returns may have been presented there.  James Hayes, a forensic document examiner, testified that the first version (exhibit 109A) contained the signature of Maureen Gleason, a nonlawyer, naming her as the general partner and taxpayer partner for GMS.  Hayes opined that Maureen Gleason's signature, the name "Maureen T.," an identifying number and the date that she signed it were deleted from the tax return to create another tax return (exhibit 109).  Hayes also noted that Charles Farley's name, "Nancy J." and a social security number were added to exhibit 109.  Dowd argued that the evidence was relevant because it impacted the credibility of Maureen Gleason, Doug Shreffler and Judith Gleason, since exhibit 109 was admitted at trial as Defense exhibit 84.  Defense counsel argued that exhibit 109A was a draft and it is unknown whether it was actually filed.  

Notably, the trial court explicitly states in its written order that it could not "make a complete determination of this [tax return] issue because the Court has no way of knowing which of these Returns was actually produced at the ARDC proceeding.
(footnote: 6)"  

The reopened proofs also involved Dowd's attempt to prove that defense witnesses perpetrated some type of bank fraud by using the allegedly falsified documents in their loan applications.  The court wrote in its order that it could "make no final determination on this as this issue is not properly before the Court."  

In both apparent attempts to discredit defendants, the trial court ultimately declined to reach the issues raised therein.  As courts are presumed to have considered only competent evidence and the admission of incompetent evidence is considered harmless in a bench trial, no prejudice resulted to defendants.  
Moran Transportation Corp. v. Stroger
, 303 Ill. App. 3d 459, 472, 708 N.E.2d 508 (1999).  The trial court here did not abuse its discretion in denying defendants' motion for a mistrial.  

V. CONCLUSION

For the forgoing reasons, we affirm the trial court's rulings and award of damages.

Affirmed. 

GORDON and McNULTY, JJ.

FOOTNOTES
1:
A full factual background can be found in 
Dowd & Dowd v.

Gleason
, 284 Ill. App. 3d 915, 672 N.E.2d 854 (1996). 

2:
Now deceased.

3:
The supreme court noted that the dismissal of the conspiracy count as duplicative of other theories of recovery alleged in the complaint was, at that point in the proceedings, premature.  
Dowd & Dowd, Ltd. v. Gleason
,  181 Ill. 2d 460, 486 (1998).  

4:
The projected profit and loss statement for the new firm is

not cited to in the briefs.  

5:
Though defendants mention only Gleason, the trial court's order refers to all defendant-attorneys.

6:
Timothy Nolan filed a complaint with the ARDC in September 1994 against Nancy Gleason, which was dismissed sometime in the fall of 1994.