NOTICE

Decision filed 12/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230316-U

NO. 5-23-0316

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| KATHLEEN A. LANGE, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-D-705 |
| | ) | |
| DAVID A. LANGE, | ) | Honorable |
| | ) | Stacy L. Campbell, |
| Respondent-Appellant and Cross-Appellee. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justice Sholar[1] concurred in the judgment.[*]

**ORDER**

¶ 1    *Held*:    The circuit court's November 22, 2022, order (a) classifying certain farm real estate, the Gorham Farm, as marital property was not against the manifest weight of the evidence, (b) setting the amount of child support was not an abuse of discretion, and (c) awarding the parties joint parenting time and responsibilities was not against the manifest weight of the evidence. However, the circuit court's order denying petitioner's request to re-open proofs was an abuse of discretion.

¶ 2    Respondent, David A. Lange, appeals the circuit court's order classifying certain farm real estate, the Gorham Farm, as marital property. Petitioner, Kathleen A. Lange, cross-appeals the circuit's order setting the amount of child support and awarding the parties joint parenting time

---

[1]Justice Sholar was substituted to the panel after oral argument was held. She has reviewed the parties' briefs and listened to the oral argument recording in this case.

[*]Justice Welch fully participated in this decision prior to his passing earlier this year.

1

and responsibilities. For the following reasons, we affirm in part and reverse in part the findings and judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Pre-Trial

¶ 5      Kathleen Lange and David Lange were married on April 16, 2011. On September 9, 2019, Kathleen filed her petition for dissolution of marriage. The parties had two minor children, J.L. and A.L. On June 4, 2020, the circuit court entered a temporary parenting order that provided, *inter alia*, that David would have parenting time with the children each week from Tuesday at 7 a.m. until Thursday at 7 a.m. and alternate weekends from Friday at 2:45 p.m. until Monday at 7 a.m. Each parent was to have seven consecutive days of summer parenting time which was to include the respective parent's weekend. The temporary order was in effect at the time of the final hearing in the case on November 14 - 15, 2022.

¶ 6      Prior to trial, the guardian *ad litem* filed her investigative report and supplemental report. The report addressed each of the best interest factors as set forth in section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/602.7 (West 2020)). It stated, "After having reviewed the factors above as to the allocation of parental responsibilities, and parenting time, I believe that the parents should be jointly allocated parental responsibilities and awarded equal parenting time."

¶ 7                                    B. Trial

¶ 8                                    1. David Lange – First Day

¶ 9      The trial in this case commenced on September 14, 2022. Counsel for Kathleen called David as an adverse witness. David testified that he and Kathleen were married on April 16, 2011. They had two minor children, J.L. and A.L. Prior to the commencement of the dissolution

2

proceedings, Kathleen was the children's primary caretaker and David was the family's primary wage earner. David agreed that Kathleen remained the primary caretaker until the court entered its June 4, 2020, temporary order pertaining to parenting time. Before dissolution proceedings were initiated, Kathleen always took the children to their medical appointments. However, after the temporary order was entered, David took them a few times when they were with him.

¶ 10 David further testified that the children participated in a number of extracurricular activities—soccer, baseball, and swimming. Kathleen enrolled them in the activities and David did not object. He took them to a few swimming lessons. While Kathleen also always attended the lessons to which David took them, David attended the lessons to which Kathleen took them when he "was able to." Both of the children mentioned to David that they wanted to participate in Cub Scouts. However, he told them they could not do so because he wanted to do other activities with them and they were already participating in three sports. He and the children would do activities such as visiting State Parks.

¶ 11 David testified that the children attended a Catholic school. He took them to Sunday mass 4-5 times in the past year. He "probably" attended Wednesday mass with them sometimes, but he was usually working so he was unable to go.

¶ 12 David testified that he and Kathleen did not share finances. They held separate bank accounts throughout the marriage and did not have access to the other's funds. His primary checking account, which he had before marriage, was with Busey Bank. When asked by Kathleen's counsel if "the fruits of your labor while you were married" went into his this Busey account, David answered in the affirmative.

¶ 13 David further testified that during the marriage, Kathleen loaned money to his parents. The loans were in writing and carried interest. The funds were advanced from Kathleen's bank account

3

which was held in only her name. David's parents repaid the loans, with interest, to Kathleen alone. Kathleen also loaned money to David's company, Lange Contracting LLC. David paid off that loan.

¶ 14     Regarding income, David testified that his accountant sorted his income into three categories—snow removal/backhoe operations, farming, and wages. A large part of his income each year came off his tax return as depreciation. He acknowledged that for purposes of child support, that depreciation was included as income and was reflected in his financial affidavit.

¶ 15     David testified that the only real estate he and Kathleen owned jointly was the marital home and farm land in Gorham, Illinois (Gorham Farm). David agreed that at the closing on the Gorham Farm, Kathleen hesitated at entering into the transaction because she did not want to be responsible for any shortfall on repayment.

¶ 16     David testified that between 2018 and July 2020 he bought and sold two luxury boats. He purchased the first boat for $150,000 and sold it for $170,000. He then bought the second boat for $190,000; he applied the $170,000 from the sale of the first boat and added $20,000. The purchase was paid in five installments. The first installment, $20,000, was paid by him from his Busey account to the seller. The remaining four installments were paid to the seller by his mother, but he repaid her. He believed repayment was made through his Busey checking account. However, when shown an exhibit of his Busey statements and questioned about where the payments were to be found in those statements, he was unable to point to any such payments.

¶ 17     When questioned by his attorney, David confirmed that he and Kathleen always maintained separate bank accounts and did not have access to each other's accounts. He asserted that Kathleen never had any involvement in the operations of his business.

4

¶ 18    When asked by his attorney if his mother gifted $170,000 to buy a boat, David answered in the negative. When questioned about the sizeable reduction in the balance in his Busey account from 2019 to the present, he testified that the balance decreased because he was not "going after the work I used to do" because he was spending more time with the children. He stated that it also decreased because he had lost contracts for his snow removal business.

¶ 19                            2. Kathleen Lange

¶ 20    Kathleen testified that she worked for Negwer, which was a door company, and its predecessor, Lion Industries, for 18 years. Her job afforded her flexibility regarding her hours.

¶ 21    Kathleen further testified that for the 24 months preceding the commencement of dissolution proceedings, the children were with her "99 percent of the time." Even if David were home, she took the children with her to do errands because David "just didn't want to care for them." On the rare occasions that the children stayed with David, while Kathleen was out, she would receive from him "four, five phone calls in an hour—what do I do? What do I do?" She got the children ready for school and daycare and took them, even if David was at home. If David was home, he would stay in bed until he thought Kathleen and the children were gone.

¶ 22    Kathleen asserted that the children were with her 100% of the time during the Covid pandemic. During the pandemic, Kathleen worked from home and, at the same time, the children did remote learning as the school was closed. David never had them during the day at that time. In the fall of 2020, when "regular" school was back in session, she returned to the office.

¶ 23    Kathleen testified that after the 50/50 parenting time arrangement was ordered, there were a number of issues with school. When the children were not with her, they "weren't necessarily doing homework." Kathleen stated that the children were doing well in school. She believed they were doing so well because she took the time to study with them.

¶ 24    Kathleen further testified that when the children were with her, they had a set, daily routine. They would also attend friends' and classmates' birthday parties, and their own sporting events. Kathleen went to every practice and game. David would not attend on the days the children were with Kathleen. Sometimes the children were on different teams and would have games at the same time. Kathleen described how, when there were separate soccer games, she would stand in the middle between their two fields so she could watch both of them. David typically stood where he could see J.L. playing, but not A.L. Typically, David would not be near the field but would instead be off to the side where he was looking at his phone.

¶ 25    Kathleen testified that when the children were with her, they did many activities. They went to the Zoo, the Science Center, the Magic House, and parks. They would also go swimming, hiking, biking, and camping.

¶ 26    Kathleen further testified that when the children returned to her after being with David, their clothes were "dirty," they smelled bad, and they were "starving." Sometimes their underwear was soiled.

¶ 27    Kathleen asserted that she put the children's needs first. She believed that David did not put them first, but instead put himself first. However, she did not talk negatively about him to the children.

¶ 28    When questioned by David's attorney, Kathleen acknowledged that other than a disagreement over whether the children would participate in Cub Scouts, she and David agreed on the children's activities. She had no concerns that the children were in too many activities. Kathleen agreed that J.L. got straight A's in school while the June 2020 parenting time order was in effect. A.L. was too young to have grades.

¶ 29    Kathleen testified that during the marriage, in 2013, she and David purchased the Gorham Farm. A down payment of $300,000 was made. Kathleen acknowledged that the down payment was not made from her account. She further acknowledged, a 1031 Exchange was made when the Gorham Farm was purchased and those funds involved the sale of property David owned prior to the marriage. In 2021, David purchased another farm, the Tilden Farm. Kathleen was not involved at all in the purchase of that farm.

¶ 30    Kathleen further testified that she did not dispute the current appraisal valuing the Gorham Farm at $1,458,000. She believed that the debt on the farm was currently a little under a million dollars. Kathleen denied that she was included on the deed and the mortgage on the Gorham Farm only because the bank required that she be. The Gorham Farm, the marital residence, and a jon boat were the only properties that she and David held jointly. At one point, she loaned $30,000 and $35,000 to David's parents for a loan on their farm on which they were about to default. The Gorham Farm was used as collateral for their loan. If David's parents had defaulted on the loan on their farm, she and David could have lost the Gorham Farm as a result. However, David's parents repaid the loans. Kathleen did not know which bank held the loan on the Gorham Farm. She did not make any payments toward the outstanding farm loan, taxes, or insurance, from any bank account that was in her sole name. Kathleen stated that when they bought the Gorham Farm, they entered into the purchase jointly and "[i]f it succeeded, we both succeeded. If it failed, we both failed."

¶ 31    Kathleen testified that before the purchase of their marital home, she and David lived in her "little house." When they purchased the marital home, her previous house was rented for a time. When it was sold, part of the proceeds paid off the existing mortgage and the rest was put into accounts that became marital accounts that went toward the marital home. David's name was

7

never on the mortgage for the marital home although it was on the deed. Kathleen agreed that David had equity of $60,000 in the home, she paid him $60,000 for that equity, and he signed the deed over to her.

¶ 32                                    3. David Lange – Second Day

¶ 33     On the second day of trial, David, testifying on his own behalf, confirmed that the Gorham Farm was valued at $1,458,000 and was held jointly with Kathleen. He testified that when the farm was purchased, he made the down payment through a 1031 Exchange from the sale of real property that he bought in 2008 and owned pre-marriage and from the grain sold from that property. He explained that a 1031 Exchange allows one to sell farm property and pay no capital gains taxes if similar property is purchased within an allotted timeframe. David testified that at the closing on the Gorham Farm, Kathleen indicated she was nervous about having a mortgage amount of over $1,000,000 and said that she would not take care of the payments on it. He made all mortgage and insurance payments on the Gorham Farm from his bank account while Kathleen made none from hers.

¶ 34     David further testified that Kathleen's name was placed on the deed to the Gorham Farm only because First State Bank of Campbell, the bank where the loan was acquired, required that it be included. His banker there was Gary Buch who also helped David with the purchase of his 2008 farm. He never intended to gift Kathleen his interest in the proceeds from his 2008-purchased property and the two never discussed a gifting of the proceeds. In 2021, David purchased another farm. However, Kathleen's name was not on that property. For the down payment, he used the $60,000 payout he received from Kathleen for his share of the marital home.

¶ 35     On cross-examination, David agreed that he made contributions to the checking account held in Kathleen's name which went to pay toward the marital home mortgage, school tuition, and

8

daycare. He made these contributions from his Busey account. He further acknowledged that he deposited $171,000 into the Busey bank account on January 31, 2021, from the sale of a boat that was bought during the marriage and shortly thereafter made a payment of $83,000 on the Gorham Farm. On re-direct, David stated that he took $130,000 from the sale of the 2008 farm, deposited it into his Busey account, and then paid that amount at the closing of the Gorham Farm.

¶ 36                                 4. Guardian *ad litem*

¶ 37    The guardian *ad litem* (GAL) presented her report to the court. She stated that she had "numerous communications" with Kathleen and David. She also met a number of times with the children via Zoom. She recently met with them in person on two occasions. Once David brought them for a meeting and once Kathleen brought them. She also spoke with the children's counselor, Julie Weber, numerous times. Additionally, she reviewed the pleadings in the case as well as documents the parties brought her.

¶ 38    The GAL indicated that the children needed the support and encouragement of both parents. However, she did not believe that either parent should be expected to attend all of J.L. and A.L.'s events, especially when those events occur during the other parent's parenting time. J.L. asked specifically to meet individually with her. He indicated to her that he liked the current schedule.

¶ 39    The GAL recommended that the parties "be allocated joint decision-making and continue an equal parenting time schedule." She indicated that while Kathleen and David had "very different parenting styles," those differences created a balance for the children that was important for them to have. She believed that the balance was especially beneficial to J.L.

¶ 40                                5. Gary Buch

¶ 41    Gary Buch, the vice president of loans at the First State Bank of Campbell Hill, testified he was the loan officer involved in the 2013 purchase of the Gorham Farm. He was also involved in the loans on the 2008 property.

¶ 42    Mr. Buch explained that a 1031 Exchange was the deferment of the payment of capital gains when one sold one property and bought another property of equal or greater value. He testified that the sale of the 2008 property and subsequent purchase of the Gorham Farm constituted a 1031 Exchange. Mr. Buch stated that David was the one who came to him about the purchase of the Gorham Farm and was with whom he dealt.

¶ 43    Mr. Buch testified that because David and Kathleen were married, as a matter of bank policy, Kathleen's signature was required on the closing documents, loan, and title to the property. The same procedure occurred when David and Kathleen refinanced the loan on the Gorham Farm in 2018. Mr. Buch did not recall there ever being a discussion about whether there was a way to avoid putting Kathleen's name on the property, either initially or at the time of refinancing. On cross-examination, Buch confirmed that with Kathleen's name on the deed and debt, her assets would be at risk should a default on the loan occur.

¶ 44                    6. Circuit Court's Findings and Judgment

¶ 45    The circuit court directed the parties to submit written closing arguments and took the matter under advisement. On November 22, 2022, the court issued its judgment of dissolution of marriage ruling which stated, *inter alia*:

>        "The parties purchased 211 acres of farmland during the pendency of the
>    marriage, which was placed into joint tenancy and paid for with marital funds from
>    the date of purchase in 2013 to the present. The Respondent sought to be awarded

a portion as non-marital property for some non-marital property which was sold, and the proceeds applied to the purchase of the land. Respondent presented testimony from his banker who confirmed it was the bank's requirement that Petitioner be listed as an owner of the property. The court did not hear testimony about Respondent trying to get a loan from a different institution that did not have such a requirement. Petitioner testified she would be on the hook if Respondent defaulted on the loan. Based on Respondent's failure to rebut the presumption[,] the funds were not a gift; the Court finds all the equity is marital."

¶ 46    Also in its judgment, the circuit court found that the parties were functioning well under the temporary shared parenting time order and were able to make joint decisions. It found it to be in the children's best interests that the parties continue to be joint decision-makers and continue to share parenting time equally, and it made permanent the temporary order entered on June 4, 2020. In addition to the other best interest factors set forth in section 5/602.7 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/602.7 (West 2020)), the court noted, regarding any other factor it found to be relevant,

> "These parents have operated under a shared parenting schedule in which the children are thriving both academically and socially. The best interest of the minor children is paramount to the Court. Consistency and the maximum involvement of both parents in the lives of the minor children are the express purposes of the Illinois Dissolution of Marriage Act. The Court has weighed heavily the fact the minor children, based upon the testimony of family, friends, neighbors, and the Guardian ad Litem are doing well under the shared parenting time."

Regarding decision-making, the court stated,

11

"The court reiterates its finding set forth above about decision-making. The parties are capable of decision-making and have been doing so throughout the pendency of this matter. *** There is no reason the parties should not be joint decision makers in this matter."

¶ 47   For child support, the court set forth,

"The reported income for child support purposes (which includes depreciation) fluctuated from $142,118.00 to $39, 887.00 between 2018 and 2020 (Respondent's Exhibits 32, 31, and 7)."

The court then found David's income was (1) $142,118 for 2018, (2) $49,977 for 2019, (3) $225,000 for 2020, and (4) $72,575 for 2021 up to the time of hearing. It then averaged those amounts "to determine Respondent's income for child support purposes is $122,417.75." It noted that there was "additional income that is unaccounted by Respondent's Financial Affidavit," based on his purchase and sale of boats. Also on November 22, 2022, it entered its judgment of allocation of parental responsibilities and parenting plan.

¶ 48   On December 12, 2022, David filed his motion to reconsider and on December 19, 2022, he filed his amended motion to reconsider. The amended motion argued, *inter alia*, that the circuit court erred when it denied him credit for his non-marital contribution made toward the purchase of the Gorham Farm and found such contribution was a gift and thus part of the marital estate. It asked the court to reconsider its finding.

¶ 49   On December 21, 2022, Kathleen filed her motion to reopen proofs and/or motion to reconsider. It averred, in pertinent part, that between November 17, 2022, and November 20, 2022, David's mother wrote three checks to him that totaled $110,000 which were allegedly for repayments of loans. It further alleged that David failed to "disclose these marital assets at any

12

time during his testimony at trial and only reflected one (1) debt on his Financial Affidavit, dated September 7, 2022, namely a 'personal loan' to his parents of $35,000.00, without any documentation." The motion stated that all three checks, copies of which were attached to the motion, were issued after the close of testimony at trial and before the circuit court entered its judgment of dissolution. The motion also argued the circuit court erred when it set child support, when it did not award primary residential parenting to Kathleen, and when it awarded David equal parenting time. The motion requested the court to reopen proofs regarding the $110,000 David received from his mother, and to reconsider the court's determination of parenting time and child support.

¶ 50    David's response to Kathleen's request to reopen proofs argued that David indicated in his deposition in this case that his family owed him $50,000 for a truck purchase and no paperwork existed regarding the debt. The response further argued that David indicated in his evidence deposition in his parents' divorce case that he loaned his parents $35,000 on April 2, 2015, and again loaned them $50,000 on March 5, 2018, and that he paid a shortfall of $110,000 to $130,000 for them on an outside loan. It averred that David's evidence deposition was in Kathleen's counsel's possession prior to trial in this case and was marked by Kathleen's counsel as a potential exhibit, but was not offered at the conclusion of her case.

¶ 51    The circuit court conducted the hearing on the parties' motions on March 27, 2023. David's counsel argued, in pertinent part, that at trial they had rebutted the presumption of gift regarding the funds contributed to the Gorham Farm. Kathleen's counsel argued that the court was correct at trial when it found the funds to be a gift. The court denied David's request to reconsider its determination that the funds that David contributed to the purchase of the Gorham Farm from pre-marital property were part of the marital estate and David had failed to overcome the presumption

13

that those monies were a gift to Kathleen. It stated that it had taken into consideration that it heard testimony from only one banker from one bank while there was no evidence presented that David had inquired at other banks where the requirement that Kathleen be included on the deed and mortgage may not have been mandatory.

¶ 52    Regarding Kathleen's request to reopen proofs, counsel for Kathleen argued, *inter alia*, that the three checks totaling $110,000 David's mother wrote to him were written and received after the conclusion of the trial in September 2022 and before the judgment order was entered in November 2022. She opined that the only mention of a potential loan to David's mother was $35,000 revealed in Exhibit 1 which was David's financial affidavit. Counsel further argued that $110,000 was "a substantial percentage of the assets of the parties." She asked that the court either reopen proofs or reconsider the distribution of assets in light of the $110,000 received by David and award each of them half the amount.

¶ 53    David's counsel argued that David disclosed that his family owed him money and Kathleen could have presented evidence at trial about the money owed but chose not to do so. He averred that Kathleen had no excuse for not having presented the evidence at trial months before and now there was insufficient reason to reopen proofs on the matter.

¶ 54    The court denied Kathleen's motion to reopen proofs. In doing so, it stated it had "taken into consideration if there were loans, if there were not loans and how the Court divided the debts and assets as well as calculated the child support."

¶ 55    Counsel for Kathleen next requested that the court reconsider its decision not to designate Kathleen as the primary residential parent and to award the parties equal parenting time and decision-making responsibilities. She averred that the evidence was clear that Kathleen had been the primary caretaker and decision-maker for the children throughout the marriage while David

14

did the "bare minimum" while her client "does all the rest." David's counsel argued that although Kathleen may have been the children's primary caretaker in the 24 months proceeding the filing of the petition for dissolution, it did not "trump the fact of what went on in the 27 months following that from June of 2020" when the temporary order awarding equal parenting time was entered. He maintained that the court "appropriately applied the factors" and asked the court to deny the motion to reconsider.

¶ 56    The court denied Kathleen's motion to reconsider its order concerning parenting time. In doing so, it noted that its written judgment order stated clearly that Kathleen was the children's primary caregiver for the 24 months preceding the filing of the petition for dissolution. It stated that it considered and "weighed all of the other factors which are laid out in the Judgment of Dissolution of Marriage and then made the decision to split the parenting time equally in this case."

¶ 57    David filed his notice of appeal on April 28, 2023. Kathleen filed her notice of cross-appeal on May 10, 2023.

¶ 58                                      II. ANALYSIS

¶ 59                                   A. The Gorham Farm

¶ 60    We begin our analysis by determining whether David overcame the presumption that he made a gift to the marital estate when the proceeds of the 1031 Exchange were applied to the purchase of the Gorham Farm. The circuit court's "classification of property will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or when the court's findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.* The Act creates the presumption that all property acquired during the marriage is marital property, regardless of the manner in which title is held.

15

*In re Marriage of Hunter*, 223 Ill. App. 3d 947, 951 (1992); 750 ILCS 5/503(b)(1) (West 2020). Generally, the placing of title to non-marital property in joint tenancy " 'will raise a presumption that a gift was made to the marital estate, and the property will become marital property.' " *In re Marriage of Vondra*, 2016 IL App (1st) 150793, ¶ 14 (quoting *In re Marriage of Benz*, 165 Ill. App. 3d 273, 279 (1988). The presumption can be overcome by clear and convincing evidence. *Id.*; *In re Marriage of Rogers*, 85 Ill. 2d 217, 222-23 (1981). The proponent arguing that the property is nonmarital carries the burden of proof. *Romano*, 2012 IL App (2d) 091339, ¶ 45; *In re Marriage of Johns*, 311 Ill. App. 3d 699, 703 (2000). The factors used to determine whether the presumption of a gift has been overcome include (1) making of improvements, (2) payment of taxes and mortgages, (3) occupancy of the premises as a home or business, and (4) extent of control and management of the property. *Hunter*, 223 Ill. App. 3d at 952.

¶ 61    David argues that he proved by clear and convincing evidence that the non-marital contribution he made toward the Gorham Farm was acquired by a method listed in section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/503(a) (West 2022)) and was not intended as a gift to Kathleen. He avers it was uncontroverted at trial that the proceeds from the 1031 Exchange were his non-marital property. He further argues that the financial relationship between the parties showed that the transfer was not intended as a gift. He opines that the financial relationship was such that he and Kathleen maintained separate bank accounts, and that Kathleen loaned both David and his parents' money from her account which they repaid with interest and she deposited the repayments into her account. David argues that Kathleen admitted at trial that they did not commingle their accounts and neither had access to the other's accounts or account statements. He asserts that he is the one who submitted the loan application for the Gorham Farm and Kathleen's name was listed on the property only because the bank required that

16

it be so. David argues that Kathleen made no payments from any funds that she controlled toward the debt on the Gorham Farm and did not even know the name of the bank that held the mortgage. He avers that he solely managed and operated the property.

¶ 62    Kathleen argues that the circuit court did not err by finding that David failed to overcome the presumption that his contribution to the purchase of the Gorham Farm was a gift. She avers that it was undisputed at trial that during the marriage, David used approximately $250,000 in marital income to pay the real estate taxes and loan payments on the property. She further argues that once David deposited the funds, he commingled the funds with his earnings. Kathleen asserts that she loaned David's parents $65,000 for them to pay loans which were attached to the Gorham Farm as collateral. She opines that she was present at the closing of the Gorham Farm and assumed liability for the full amount of the loan.

¶ 63    Here, the evidence established that David made the mortgage, insurance, and tax payments for the Gorham Farm from the Busey account that was held in his sole name. David's testimony established that he deposited his income during the marriage into the same Busey account. Moreover, as he testified, he transferred money from that account to the account Kathleen held in her sole name to pay for the marital home mortgage, tuition fees, and daycare.

¶ 64    It was undisputed that David made the tax, insurance and mortgage payments, using an account held in his name alone. However, although the aforementioned factors are useful when discerning intent, "they are not the exclusive criteria for determining whether or not a transfer of property into joint tenancy is a gift." *In re Marriage of Marriott*, 264 Ill. App. 3d 23, 39 (1994). Ultimately, however, "the focal point of any discussion dealing with the presence or absence of a gift is the intent of the alleged donor." *Id.* "Donative intent is the intention on the part of the donor

17

that there be a present and irrevocable transfer of title to the subject matter of the gift." *Moniuszko v. Moniuszko*, 238 Ill. App. 3d 523, 529 (1992).

¶ 65    In their testimonies, the parties acknowledged they held separate bank accounts throughout their marriage. The financial affidavits in the record reveal that they also titled some property separately, *i.e.*, their respective vehicles. However, as borne out by their testimonies, they chose to title the marital residence, a jon boat, and the Gorham Farm in joint tenancy. As noted by Kathleen in her testimony, she sold her pre-marital home and those funds were used for the marital residence which, as previously noted, was placed in joint tenancy. She acknowledged those funds were a gift to the marital estate.

¶ 66    David argues that this case should be controlled by the *Hunter* decision. However, we find that case distinguishable. In *Hunter*, the parties disputed the classification of real estate that the wife's parents had deeded to her and the husband in joint tenancy, reserving themselves a life estate. *Hunter*, 223 Ill. App. 3d at 948. After the wife's father died, the wife managed and maintained the premises by locating tenants for the property, collecting the rent, and depositing the rent payments into her personal accounts. *Id.*

¶ 67    However, there was no evidence in *Hunter* that the property carried a mortgage. Here, though, Kathleen's name was on the deed *and* mortgage of the Gorham Farm which made her equally liable in the event of default. In fact, she would have been liable had David's parents defaulted on *their* property because the Gorham Farm was used to secure their mortgage at one time. As pointed out by Kathleen, had a default occurred and the Gorham Farm been foreclosed upon, David likely would not be arguing that *he* should carry a bigger share of the financial repercussions. Moreover, as pointed out by the circuit court, there was no evidence that David tried to title and mortgage the Gorham Farm to exclude Kathleen. In fact, as the testimony revealed,

18

neither was there an attempt on David's part to title or mortgage the Gorham Farm in his name alone when the couple later refinanced. All these facts point to the parties' intent that the Gorham Farm, like the marital residence, be a joint venture. Considering all the evidence, we cannot say that the circuit court's finding that David failed to overcome the presumption of a gift was against the manifest weight of the evidence.

¶ 68                                    B. Request to Re-Open Proofs

¶ 69    Next, we determine whether the circuit court erred when it denied Kathleen's request to re-open proofs pertaining to $110,000 received by David from his mother after the close of the trial but before the judgment order was entered. This court reviews an order denying a motion to reopen proofs for an abuse of discretion. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 53. "If evidence offered for the first time in a post-trial motion could have been produced at an earlier time, it is not an abuse of discretion for the court to deny its introduction into evidence." *In re Marriage of Davis*, 215 Ill. App. 3d 763, 776 (1991). Nonetheless, the circuit court "should consider whether the moving party has provided a reasonable excuse for failing to submit the additional evidence at trial, whether granting the motion would result in surprise or unfair prejudice to the opposing party, and if the evidence is of the utmost importance to the movant's case." *Dowd & Dowd Ltd. v. Gleeson*, 352 Ill. App. 3d 365, 389 (2004). Additionally, "greater liberty should be allowed in reopening proofs when the case is tried before the court without a jury." *Dunahee v. Chenoa Welding & Fabrication, Inc.*, 273 Ill. App. 3d 201, 210 (1995); *In re Marriage of Phillips*, 229 Ill. App. 3d 809, 822 (1992).

¶ 70    Kathleen argues that the circuit court erred when it denied her request to re-open proofs. She asserts that there was no testimony by David at trial that his parents owed them $110,000, no documents provided showing the transfer of these funds from David to his parents, and no

promissory notes existed. She avers the only reference to any possible outstanding loan, in the amount of $35,000, was set forth in David's financial affidavit. She further argues that there would have been no surprise or prejudice to David if he claimed not to have known about these loans. She opines that if David's mother paid him the money as was claimed by David in his response to the motion to re-open proofs, and there was no promissory note or obligation to pay, then the funds received by David were presumed to be a gift. Kathleen asserts that the fund transfer was suspect.

¶ 71    David argues that Kathleen's brief makes no reference to any testimony or exhibits presented at trial for which this court can form a basis to consider this issue. He avers the only information before the circuit court was that contained in David's response to the motion to re-open proofs wherein it was asserted that all the information sought to be admitted was in counsel's possession at the time of trial and, although never offered into evidence, was marked as a potential petitioner's exhibit by Kathleen.

¶ 72    Here, we find the factors used in a circuit court's decision whether to reopen proofs weigh in Kathleen's favor. First, a review of the record shows that David only disclosed $35,000 owed by his parents in his financial affidavit. He did not testify that his parents owed him a specific amount of funds. Rather, he testified vaguely to monies lent to his parents over the years, but gave no specifics, and there was no "paper trail" for those exchanges. There were no promissory notes or other written documentation to put Kathleen on notice that David's parents owed $110,000. Notably, in his answer to Kathleen's motion to reopen proofs, David's references to his depositions in this case and in his parents' case about the amounts owed by his family are, at best, confusing, and do not pinpoint a set amount of debt. Rather, they vary from $35,000 to $50,000 to $75,000 to $110,000 to $130,000. Second, we do not see how granting the motion to reopen proofs as to the amount received would have resulted in surprise or unfair prejudice to David. As noted by

20

Kathleen, the money was owed by David's own family members. Third, determining whether those funds were marital or non-marital property would consequentially affect Kathleen's share of marital property as the amount was significant which makes the determination of utmost importance to Kathleen's case. Thus, we find that the circuit court's denial of Kathleen's motion to reopen proofs was an abuse of discretion. However, we make this finding only as it pertains to reopening proofs concerning David's receipt of the $110,000.

¶ 73                                C. Child Support

¶ 74    Now we turn to the question of whether the circuit court erred when it set the amount of child support. "The trial court has wide discretion in awarding child support and its decision will not be reversed by a court of review absent an abuse of discretion." *Slagel v. Wessels*, 314 Ill. App. 3d 330, 332 (2000).

¶ 75    Kathleen argues that the circuit court erred when it set the amount of child support based solely on David's tax returns. She avers the court failed to consider David's lack of credibility regarding his actual income. She argues the court failed to include the income he earned by buying and selling other property, such as boats, when determining net income for child support purposes.

¶ 76    David argues that the circuit court did not abuse its discretion when it set child support. He further argues that the court heard the testimony of the parties and had their tax returns and bank statements available when determining the support order. He avers that the court's order set forth its findings showing that it not only took David's income for tax purposes but used that income and then factored back in depreciation when arriving at his net income.

¶ 77    Here, in its order, the circuit court set forth the income of each of the parties. Pertaining to David who was self-employed and whose annual income fluctuated from $49,977 to $225,000 for the years of 2018, 2019, 2020, and 2021 up to the date of trial, the court averaged those amounts

which is common practice. In cases such as this where income fluctuates greatly from year to year, "[a]t least the three prior years should be used to obtain an accurate income picture." *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995). However, "the number of years to consider generally 'must be left to the discretion of the trial court, as facts will vary in each case.' "*In re Marriage of Gariel*, 2020 IL App (1st) 182710, ¶ 41 (quoting *Freesen*, 275 Ill. App. 3d at 103).

¶ 78    In addition to averaging David's income, the circuit court specifically noted that David purchased and sold three boats ranging in price from $150,000 to $190,000 and that based on the purchase and sale of the boats, additional income was unaccounted for by David's financial affidavit. This indicates that the court considered this additional income. Considering the court's averaging of David's income and noting there to be unaccounted income from the sale of the boats, we find the circuit court did not abuse its discretion when it determined child support.

¶ 79                     D. Parenting Time[2] and Decision-Making

¶ 80    Kathleen argues that the circuit court erred by not awarding primary residential parenting time and responsibilities to her. She asserts that she provided the majority of the caretaking responsibilities for the children for the 24 months preceding the filing of the petition for dissolution of marriage. She further argues that after the filing, she continued to take primary responsibility for medical care, and extracurricular, religious, and school activities.

¶ 81    David argues that the circuit court did not err when it determined parenting time and decision-making. He avers that Kathleen wants this court to focus only on the factor of who

---

[2]This case involves the disposition of child custody or allocation of parental responsibilities and is therefore governed by Illinois Supreme Court Rule 311 (eff. July 1, 2018) which provides for the accelerated disposition of these issues. However, David requested four extensions of time to file his appellant's brief and Kathleen requested five extensions of time to file her appellee's/cross-appellant's brief. All requests were granted without objection. Therefore, we find good cause for issuing this disposition more than 150 days after the filing of the notice of appeal or granting of leave to appeal. Ill. S. Ct. R. 311(a)(1), (a)(5) (eff. July 1, 2018).

primarily took care of the children before the filing of the petition for dissolution of marriage. He argues that by the time the final parenting time ordered was entered, the parties had been operating well for some 29 months under the temporary order with the same parenting time and decision-making arrangement.

¶ 82     "An appellate court 'will not reverse a trial court's custody determination unless it (1) is against the manifest weight of the evidence, (2) is manifestly unjust, or (3) results from a clear abuse of discretion.' " *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24 (quoting *In re B.B.*, 2011 IL App (4th) 110521, ¶ 32). Under the manifest weight standard, this court will affirm the circuit court's ruling provided there is any basis in the record to support the circuit court's determination. *Id.*

¶ 83     At the time of the final hearing in this case, the parties had been sharing joint parenting time and responsibilities for over two years pursuant to the temporary order. While Kathleen wants this court to look specifically at her care for the children in the 24 months leading up to the filing of the petition for dissolution, this is but one of several best interest factors that the court shall consider. 750 ILCS 5/602.7(b) (West 2022).

¶ 84     The circuit court set forth in its November 22, 2022, order its reasoning for finding joint parenting was in the children's best interests. In fact, it listed the best interest factors as set forth in the Illinois Marriage and Dissolution of Marriage Act and set forth reasoning to the factors relevant to the facts of this case. *Id.* For instance, it noted, referring to the GAL's report, that "the children are happy with the current temporary schedule that has been in place for years." It further noted that the children had "a good relationship with both parents." The court found it undisputed that the children were well-adjusted "to their current home, community, and school" and that it "did not hear of any issues with the space where [David] resides." It opined that "[t]he children

23

need the love and support of both of their parents" and "both parties have demonstrated a willingness and ability to place the needs of the children before their own needs." It praised the parties for working "commendably well during this case." It noted that the only significant disagreement arose over the childrens' participation in Cub Scouts. The court found that the parties could "facilitate a relationship between the other parent and the children." Lastly, it specifically referred to the 29-month period of joint parenting and noted the children were thriving. It expressed that "consistency and the maximum involvement of both parents in the lives of the minor children are the express purposes of the Illinois Dissolution of Marriage Act." "A court may consider the period of time that a child has spent with a parent by virtue of a temporary custody order." *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 78 (1996). It is important to maintain stability and continuity in the environment of a young child. *Hall v. Hall*, 226 Ill. App. 3d 686, 690.

¶ 85     Here, the circuit court was very clear upon what bases it formulated its decision regarding the allocation of parenting time and responsibilities. It did not rest upon only one or even a few bases. Rather, it set forth its reasoning based upon each of the best interest factors. Here, we find that the circuit court did not abuse its discretion, the decision was not against the manifest weight of the evidence, and it was not manifestly unjust.

¶ 86                                      III. CONCLUSION

¶ 87     For the foregoing reasons, we affirm the circuit court's order (a) classifying the entirety of the Gorham Farm as marital property, (b) setting child support, and (c) awarding the parties' joint parenting time and responsibilities. We reverse the circuit order denying Kathleen's motion to re-open proofs pertaining to the $110,000 received by David from his mother after the close of evidence and before entry of the judgment and remand the matter to the circuit court for a hearing specifically and only on that issue.

¶ 88    Affirmed in part, reversed and remanded in part.